2005 UT App 351

**Nadine GILLMOR, Plaintiff, Appellant, and Cross-appellee,**

v.

**Robin MACEY; Ken Macey; Family Link, L.L.C., a Utah limited liability company; and David K. Richards & Co., a Utah corporation, Defendants, Appellees, and Cross-appellants.**

**No. 20030368–CA.**

Court of Appeals of Utah.

Aug. 25, 2005.

David W. Scofield and Ronald F. Price, Peters Scofield Price, Salt Lake City, for Appellant.

Keith W. Meade, Cohne Rappaport & Segal, Elizabeth T. Dunning, and Eric G. Maxfield, Holme Roberts & Owen LLP, Salt Lake City, for Appellees.

Before Judges BENCH, JACKSON,[1] and ORME.

## OPINION

ORME, Judge:

¶ 1 Appellant Nadine Gillmor (Nadine) appeals from several aspects of the trial court's interpretation of an "Easement And Use Agreement" (the Agreement). Appellees and Cross–Appellants Robin and Ken Macey (the Maceys), individually and as owners of Family Link, L.L.C., and David K. Richards & Co. (Richards Co.), likewise cross-appeal from some of the trial court's interpretations of the Agreement. We affirm in part and reverse in part.

## BACKGROUND

¶ 2 The genesis of this case dates back to a 1984 dispute between Nadine's late husband, Charles Frank Gillmor, Jr. (Frank), and David K. Richards (Richards). In 1984, Richards verbally challenged the right of people hunting on Frank's property (the Gillmor property[2]) to use two livestock trails—the Perdue Creek Road and the Neil Creek Road—which ran across Richards's property from the Weber Canyon highway to the Gillmor property. Frank began litigation to enjoin Richards's interference with his and his family's and friends' use of the roads and to claim a prescriptive easement over both trails. Frank claimed that the Gillmor family had held a right of way over the dirt roads, and any appurtenant property necessary for animal husbandry, since at least the early 1920s.

■ ¶ 3 In 1985, rather than pursue their opposing claims through litigation, Richards and Frank negotiated the Agreement, which granted Frank express easements "over and across the Perdue Creek Road and over and across the Neil Creek Road from the intersection of said roads with State Highway 213 (known as the Weber Canyon Road) over and across the Richards Property." The Agreement also placed several limitations on the purposes for which the easements could be used. During oral argument before us, Nadine characterized Frank's concessions in settling the litigation as essentially giving up most of his rights in the Neil Creek Road, since Richards had a cabin located near the Neil Creek Road, and accepting in lieu of those rights certain rights of access over the Perdue Creek Road.[3] Once

---

1. Judge Jackson, who retired on August 1, 2005, participated in resolving this appeal and voted to concur in this opinion prior to his retirement.

2. Frank's property is a piece of a larger parcel of property that was once owned jointly by Frank's father and uncle. Frank and his brother, Edward Leslie Gillmor, each inherited a one-quarter interest in the property from their father. Their cousin, Florence Gillmor, inherited her father's one-half interest in the property. The three owned the property as tenants in common until they eventually partitioned the property into their respective shares, with the assistance of the Utah judiciary. *See Gillmor v. Gillmor*, 657 P.2d 736 (Utah 1982) (reviewing trial court's decree partitioning Gillmor property).

3. We note at the outset that the Agreement was created between the parties as a virtual, if not actual, settlement of litigation. As a result, we approach it as a settlement agreement.

   It is a basic rule that the law favors the settlement of disputes. Such agreements under the proper circumstances may be summarily enforced. However, whether a court should enforce such an agreement does not turn merely on the character of the agreement. An agreement of compromise and settlement constitutes an executory accord. Since an executory ac-

the parties reached settlement in 1985, they had very little disagreement about the use of the roads for over a decade.

¶ 4 Frank Gillmor passed away in 1995. Frank was survived by two daughters from a previous marriage and Nadine, his spouse at the time he entered into the Agreement and at the time of his death.[4] After Frank's death, Nadine, her daughter, her son-in-law, and her grandchildren continued using the Gillmor property as well as the easements that were the subject of the Agreement. In 1999, the Maceys, as owners of Family Link, L.L.C., acquired part of Richards Co.'s property. In 2000, the Maceys began construction of a summer home on their property, which was located near the Perdue Creek Road. Also in 2000, the Maceys stopped Nadine's son-in-law while he was riding a four-wheeled all terrain vehicle (ATV) on Perdue Creek Road and told him that ATVs could not be driven on that road, but that they should be transported by trailer over the road to the Gillmor property. The Maceys based this assertion on the 1985 Agreement, which included as one limitation on the use of the easement that "Gillmor agrees that he will not allow use of and will not himself use any three-wheeled motorized All Terrain Vehicles or any two-wheeled motorcycles or motorized 'dirt bikes' on the Easements at any time."

¶ 5 Again in 2001, the Maceys confronted several of Nadine's grandchildren and their friends driving four-wheeled ATVs on the same road and informed the group that they could not drive the ATVs on that road. Not long after this last encounter, Nadine, like her husband had done in 1984 when the use of the livestock trails was first challenged, sought to enjoin the Maceys from interfering with her use of the easement over Perdue Creek road and to seek a declaration of her rights, status, and legal relationship with the Maceys under the Agreement, in accordance with Utah Code sections 78–33–1 to –13. *See* Utah Code Ann. §§ 78–33–1 to –13 (2002) (governing district court's "power to declare rights, status, and other legal relations" in an action for declaratory judgment). Richards Co. sought to intervene as a defendant in the action and was joined as a defendant by way of a stipulated order.

¶ 6 Ironically enough, the Agreement that was once a truce in the fight over the use of these easements is now the very source of the current dispute. Twenty years after the Agreement's creation to resolve the previous litigation, the parties became entangled in new litigation to determine what the Agreement actually means about the use of four-wheeled ATVs on the easements. Nadine moved for partial summary judgment on the question of whether four-wheeled ATVs were precluded from use on the easements under the Agreement, but the trial court concluded that the language in the Agreement was ambiguous and that it would, therefore, deny partial summary judgment and consider extrinsic evidence surrounding the formation of the Agreement to resolve the ambiguity.

¶ 7 The subsequent trial was not confined to the issue concerning four-wheeled ATVs, the dispute having transformed into a multifaceted disagreement about what exactly the Agreement says about Nadine's use of the easements in several respects. Following a bench trial, the court entered fourteen pages of findings of fact and a six-page judgment interpreting the Agreement and thereby resolving the dispute. Unsatisfied with the trial court's careful and meticulous attempt to interpret the Agreement and resolve the dispute in a fair and reasonable way, both parties now seek appellate relief from various aspects of the trial court's judgment.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 8 The parties raise a variety of issues that stem from the trial court's interpretation of the Agreement. Nevertheless, the issues mainly turn on the proper interpretation of the Agreement. Because an ease-

cord "constitutes a valid enforceable contract," basic contract principles affect the determination of when a settlement agreement should be so enforced.
*Mascaro v. Davis*, 741 P.2d 938, 942 (Utah 1987) (citations and footnotes omitted).

4. Frank and Nadine were married in November 1984. Frank and Nadine had no children together. Nadine has children of her own from a previous marriage.

ment agreement is a contract, the same rules of interpretation apply to it as apply to contracts generally. *See Canyon Meadows Home Owners Ass'n v. Wasatch County*, 2001 UT App 414,¶ 7, 40 P.3d 1148, *cert. denied*, No. 20020072, 2002 Utah LEXIS 149 (Apr. 17, 2002).

■■■ ¶ 9 "A contract's interpretation may be either a question of law, determined by the words of the agreement, or a question of fact, determined by extrinsic evidence of intent." *Peterson v. Sunrider Corp.*, 2002 UT 43,¶ 14, 48 P.3d 918 (internal quotations and citation omitted). To the extent the trial court's interpretation of the Agreement is a question of law, we review its decision for correctness, giving its interpretation no deference. *See id.* We likewise review the trial court's determination that the Agreement is ambiguous as a question of law. *See Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991).

■■■ ¶ 10 To the extent we agree with the trial court's determination that there is any ambiguity in the Agreement, the trial court's subsequent determinations as to the intentions of the parties, based on extrinsic evidence introduced to show their intent, are questions of fact. *See SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54,¶ 14, 28 P.3d 669. Thus, "if the contract is not an integration or is ambiguous and the trial court proceeds to find facts respecting the intentions of the parties based on extrinsic evidence, then our review is strictly limited." *Sunrider Corp.*, 2002 UT 43 at ¶ 14, 48 P.3d 918 (internal quotations and citation omitted). However, where the parties challenge the trial court's findings of fact, we first consider whether they have marshaled all the evidence supporting the court's findings and then have also demonstrated that, despite the evidence, the find-ings are so lacking in support as to be against the clear weight of the evidence. *See Chen v. Stewart*, 2004 UT 82,¶ 19, 100 P.3d 1177.

## ANALYSIS

¶ 11 The Agreement in this case is hardly a model of precision in legal drafting. Instead, it is an example of the type of written instrument that often earns itself an expensive trip to the courthouse, on its way to another not-so-free pass onto an appellate court and into the world of published case law, where many other contracts have been memorialized for spurring dispute rather than promulgating certainty and finality. Indeed, both parties to this Agreement, apparently in complete good faith and with some logic of terminology or context, interpret the Agreement in very different ways.

¶ 12 At the heart of Nadine's appeal is her contention that the trial court committed reversible error by imposing restrictions not expressly stated in the Agreement on her use of an easement granted to a defined group of Gillmor family members for access to the Gillmor property. Her position presumes that she has an unfettered right of access, which inured to her as Frank's successor in interest to the Gillmor Property. She specifically argues that the terms of the Agreement do not place any restrictions on (1) her ability to have friends visit the property utilizing the easements, (2) her ability to use the easements to build a new cabin on the Gillmor property, and (3) her use of ATVs on the easements, so long as they have four wheels instead of the now outdated three wheels.[5]

¶ 13 Richards and the Maceys, on the other hand, contend that the trial court erroneously interpreted several provisions of the Agreement as granting broader use of the

---

**5.** Nadine also contends that the trial court abused its discretion in refusing to allow her to amend her complaint to plead a claim for rescission of the Agreement. Her argument, however, mischaracterizes the trial court's rationale for denying the motion. Nadine selectively states that the trial court's basis for denying the motion was principally because too much time had passed between the time the Agreement was signed in 1985 and the time Nadine sought to amend her complaint to seek rescission of the Agreement in 2001. However, our review of the complete record and rationale stated by the court in denying the motion shows no abuse of discretion. *See, e.g., Tretheway v. Furstenau*, 2001 UT App 400,¶¶ 15–16, 40 P.3d 649 (stating that we will affirm district court's denial of motion to amend unless it has abused its discretion by refusing motion without any justifying reason for denial, unless reason for denial is otherwise apparent).

easements than the Agreement itself provides or than was originally intended. They specifically contend that the trial court erred (1) by failing to limit Nadine's personal use of the easements; (2) by giving the occupants of the cabin on the Gillmor Property a general right of access, as opposed to access subject to the other limitations in the Agreement; and (3) by using the term "hunters" in place of "persons" in stating its ruling on the number of persons who can use the easements for access to the property for hunting.

¶ 14 For the reasons set forth below, we conclude that although Nadine has a right to use the easements to access the Gillmor property, her right is personal to her and cannot be used to enlarge the limited purposes set forth in the Agreement for which the easements can be used, or the limited number of people who can use the easements. Thus, her ability to use the easements for construction purposes and open them up for use by her invitees is severely limited by the Agreement. We also conclude that the structure of the Agreement itself places clear limitations on the purposes and uses for which the occupants of the cabin can put the easements to use. Finally, we affirm the trial court's conclusion that the Agreement excludes the use of four-wheeled ATVs, as well as three-wheeled ATVs, on the easements.

## I. Nadine's Personal Right of Access Under the Agreement

¶ 15 Section 3(a) of the Agreement states that one of the *"Purposes of [the] Easements"* is for "[v]ehicular access (ingress and egress)" over a specified portion of the easements "for access by Gillmor and his immediate family to the first degree of consanguin[i]ty, and their spouses and children, to the Gillmor property." The trial court interpreted this phrase as granting Frank access to the Gillmor property that "is unfet-

tered by any restriction as to the purpose for the access, and none may be imposed, except the hunting restrictions set forth in Section 6, which apply to all users." The trial court further concluded "that with the death of Frank Gillmor, and based on the unambiguous language of Section 4 ('Covenants to Run with the Land'), and the intentions of the parties as determined by the court, this grant inures to the benefit of Frank's present successor, Nadine Gillmor, [just as though she were Frank, and to] her spouse, if any in the future, along with her children, their spouses and children." In the trial court's view, subject to the limitation discussed in note 7, the same would be true for any subsequent owner. We disagree.

¶ 16 The Agreement's language is seemingly ambiguous concerning whether the benefit of this specific purpose for access is appurtenant to and runs with the land, thus passing on to Nadine as Frank's successor in interest to the Gillmor property, or whether it creates a personal benefit that only extends to those who qualify as members of the identified group. The Agreement's characterization of this specific right of vehicular access, as being available only to identified individuals, conflicts with the rest of the Agreement's otherwise consistent characterization of the grants and limitations as interests that are tied to and run with the property.

¶ 17 While the Agreement states, in several places, that the grants and limitations in the Agreement are appurtenant to the land and run with the land to future successors in interest,[6] the Agreement also details a specific and limited class of individuals who are to be benefitted by this specific grant of vehicular access. The specificity of the provision granting access to "Gillmor and his immediate family to the first degree of consanguin[i]ty, and their spouses and children," undermines any notion that this benefit is

---

6. The easements are characterized as "perpetual Easements" and the easements and the limitations on the uses thereof are "declared ... to be covenants and restrictions which run with and are appurtenant to the Gillmor Property and the Richards Property," which "shall be binding upon and shall inure to the benefit of all present and future owners and/or purchasers, occupants and lessees of said Properties." Moreover, the Agreement also indicates that it "shall be binding upon and shall inure to the benefit of the parties ..., their officers, directors, invitees, agents, employees, heirs, personal representatives, successors, assigns, owners, occupants and lessees of the subject properties."

somehow intended to run with the land to the benefit of all future owners of the Gillmor property.

¶ 18 The trial court tried to harmonize the Agreement's language and give effect to all of its provisions and terms, while simultaneously relying on extrinsic evidence of the parties' intent. However, the court's interpretation unnecessarily created new ambiguities in the Agreement that would not otherwise have arisen and prompted it to create extra-contractual provisions in anticipation of subsequent transfers.[7] We decline to accept an interpretation of the Agreement that creates new ambiguities and requires the crafting of new provisions. We see a clearer, more precise interpretation that can be reached by harmonizing the Agreement's provisions in a way that gives effect and meaning to all of its terms and provisions and resolves any conflict, without needing to resort to extrinsic evidence to ascertain the intent of the parties.

¶ 19 Harmonizing conflicting or apparently ambiguous contract language before concluding that provisions are actually ambiguous is an important step in the hierarchy of rules for contract interpretation. A trial court must first " 'attempt to harmonize all of the contract's provisions and all of its terms' when determining whether the plain language of the contract is ambiguous." *Wagner v. Clifton,* 2002 UT 109,¶ 16, 62 P.3d 440 (citation omitted). "[I]t is axiomatic that a contract should be interpreted so as to harmonize all of its provisions and all of its terms, which terms should be given effect if it is possible to do so." *LDS Hosp. v. Capitol Life Ins. Co.,* 765 P.2d 857, 858 (Utah 1988). Thus, to harmonize the provisions of a contract, "we examine the entire contract and all of its parts in relation to each other and give a reasonable construction of the contract as a whole to determine the parties' intent."[8] *Brixen & Christopher Architects v. Elton,* 777 P.2d 1039, 1043 (Utah Ct.App.1989). By properly harmonizing the Agreement's provisions, we conclude that this purpose for vehicular use of the easements "for access by Gillmor and his immediate family to the first degree of consanguin[i]ty, and their spouses and children, to the Gillmor property" creates a benefit and a burden that is appurtenant to the Richards and Gillmor properties, as the servient and dominant tenements respectively. But unlike the burden that runs with the Richards property, the benefit of this very specific easement right does not run with the land to the benefit of all future owners of the Gillmor property. Rather, it is personal to Gillmor and the identified small class of his family members.[9]

7. The trial court's ruling that this grant of unfettered access to Gillmor actually inures to successive owners, starting with Nadine, opened up the possibility that the easements would be put to *much* heavier use than intended if a successor owner of the Gillmor property was actually a corporation or a consortium of owners. As a result, the trial court had to resolve what this specific language about "Gillmor and his immediate family to the first degree of consanguin[i]ty" meant "if the successor owner is not a single individual or couple, such as Frank and Nadine Gillmor." The trial court determined that "[i]t was clearly not the intention of the parties that this grant should open the easements to heavy use in the event of corporate ownership, or even purchase by a consortium of owners." Thus, after viewing extrinsic evidence of the parties' intentions, the trial court concluded that if "the record owner(s) are ever other than an identifiable immediate family (for example, siblings, and their families to the first degree of consanguinity are legitimate successors to the easement grant), then this provision will fail."

8. Thus, while some ambiguities or conflicts in contract language may seem apparent on the face of the document, they may actually be reconciled by harmonizing the seemingly ambiguous or conflicting terms. If any apparent ambiguity or conflict can be resolved by harmonizing the ambiguous or conflicting terms, a court may not conclude as a matter of law that the contract is ambiguous and take extrinsic evidence to clarify the problem. *Cf. Central Fla. Invs., Inc. v. Parkwest Assocs.,* 2002 UT 3,¶¶ 12–15, 40 P.3d 599. It follows, however, that if the court cannot resolve the problem by harmonizing ambiguous or conflicting terms, as a matter of law, then the court may properly conclude there is an ambiguity and then resort to extrinsic evidence. *See id.* at ¶ 12.

9. Our conclusion necessarily rejects Nadine's contention at oral argument that harmonizing the conflicting language of the Agreement makes the word "Gillmor" in this provision a defined term that means not just Frank Gillmor as an individual, but whoever owns the Gillmor property. "Gillmor" as it appears in the Agreement cannot be viewed so broadly. The Agreement clearly sets forth in its opening paragraph that "Gillmor" will be used in the Agreement merely

¶ 20 It is generally true that "one who succeeds to the possession of a dominant tenement thereby succeeds to the privileges of use of the servient tenement authorized by the easement." Restatement of Prop.: Servitudes § 487 (1944). It is nevertheless possible for a successor in interest of a dominant tenement to not succeed to a benefit that is personal to the original owner if it is "prevented ... by the manner or the terms of the creation of the easement appurtenant." *Id. See also id.* cmts. c, d (recognizing that language or circumstances creating easement can restrict persons able to assert it); *Nielson v. Sandberg*, 105 Utah 93, 141 P.2d 696, 700 (1943) ("An easement, being a burden upon the land which it traverses is limited to uses for which, or by which it was acquired, and to the person who acquired it, or for the benefit of the property for which it was acquired."). Indeed, the Restatement observes that "[w]hether appurtenant or in gross, a servitude benefit or burden may be personal," and that such "a servitude benefit or burden is not transferable and does not run with land." Restatement (Third) of Prop.: Servitudes § 1.5 (2000). Thus, the commentary to section 1.5 observes that

> [o]nly appurtenant benefits and burdens run with land, but the terms are not synonymous. Running with land means that the benefit or burden passes automatically to successors; appurtenant means that the benefit can be used only in conjunction with ownership or occupancy of a particular parcel of land.... Appurtenant benefits and burdens ordinarily run with land, but they may be made personal to particular owners or occupiers of the land.

*Id.* cmt. a. The result of creating an easement that grants a personal benefit to a specific group of people, like the one in this case, is that "[the] servitude benefit or burden that is personal lasts no longer than the life of the person holding the benefit or burden." *Id.* § 4.3.

¶ 21 Applying the above principles of law to the case before us, we conclude that the Agreement's language is unambiguously clear that this specific right to vehicular access over the easements is a personal benefit tied to a confined class of people, namely, "[Frank] Gillmor and his immediate family to the first degree of consanguin[i]ty, and their spouses and children." The Agreement's plain language reflects a clear intention that this use only benefit a defined and limited class of people and does not reflect any intention, as argued by Nadine, that this use "inure[ ] to the benefit of Frank's present successor, Nadine Gillmor, her spouse if any in the future, along with her children, their spouses and children" as a benefit that runs with the land.

¶ 22 The question still remains whether Nadine nonetheless benefits from this specific purpose of vehicular access, not as a successor in interest to the Gillmor property, but as a member of the class of people specifically identified in the Agreement. In other words, as we have determined that Nadine does not stand in Frank's place in this provision as a successor in interest, we must still determine whether Nadine herself is found within the provision "for access by Gillmor and his immediate family to the first degree of consanguin[i]ty, and their spouses and children." It is clear that Nadine does not qualify as Frank's "immediate family to the first degree of consanguin[i]ty," since her relation to Frank is not by blood but rather by affinity, i.e., marriage.[10] However, we

---

to identify "Charles F. Gillmor, Jr., an individual," rather than to operate like a defined term meaning the actual owner of the Gillmor property, whoever that may be. Nowhere in the Agreement is "Gillmor" defined so expansively as to indicate that when a person succeeds in ownership to the property the Agreement rewrites itself so that the subsequent owner stands in the shoes of "Gillmor" for purposes of the vehicle use aspects of the easement. The use of "Gillmor" in the Agreement merely alleviates the need to monotonously and repetitively write "Charles F. Gillmor, Jr., an individual," every time he is referred to in the Agreement. Had the parties intended that "Gillmor" mean any and all successive owners, heirs, etc., they could easily have said so in the Agreement.

10. Normally one's "immediate family" would reasonably be defined as including one's spouse as well as one's children. *See* Utah Code Ann. § 7–9–3(7) (Supp.2004) (defining " '[i]mmediate family' ... [as] parents, spouse, surviving spouse, children, and siblings of the member"); *id.* § 26–2–22(3)(a) (1998) (" '[I]mmediate family member' means a spouse, child, parent, sibling, grandparent, or grandchild[.]"); *State v. Sumpter*, 438 N.W.2d 6, 8 (Iowa 1989) (stating that

conclude that the phrase "their spouses and children" modifies and refers to the entire preceding clause "Gillmor and his immediate family to the first degree of consanguin[i]ty." As a result, Nadine, as Frank's spouse, is included in the class of people identified and, therefore, is personally benefitted by the vehicular access purpose of the easements.

¶ 23 However, given our conclusion, the grant of access is narrow as to those it benefits. Thus, Nadine's own children, as Frank's step-children, do not receive the benefit of this specifically authorized use of the easements as they are not related to Frank by any degree of consanguinity. As a result, we also conclude that the trial court erred in determining that this grant extended to Nadine's "spouse, if any in the future, along with her children, their spouses and children." Any future spouse of Nadine is plainly not anticipated or included in the language of the provision and, likewise, Nadine's children do not qualify as Frank Gillmor's immediate family to the first degree of consanguinity, nor are they Frank's children. Moreover, while the purposes for which Nadine personally and individually intends to access the Gillmor property using the easements are not limited to those purposes set forth in the Agreement—i.e., animal husbandry, property maintenance, hunting, etc.—her personal right of access does not expand the rights of any other person to use the easements or the purposes for which the easements may be used, beyond what is stated in the Agreement.

## II. The Agreement's Limitations on the Uses of the Easements

¶ 24 Where an easement is created by a written instrument, like an agreement, a grant, or a deed, the rights founded on such an instrument are "limited to the uses and extent fixed by the instrument." *Labrum v. Rickenbach*, 711 P.2d 225, 227 (Utah 1985). Thus, "[w]here the language of the grant leaves no doubt as to its meaning," the terms of the easement cannot be expanded beyond what is contained in the instrument. *Id.* Accordingly, we conclude that Nadine's personal right of access only allows her the right of access and does not modify the Agreement's clear limitations on others.

### A. Use of the Easements by Invitees

¶ 25 Nadine argues that her ability to have friends or other invitees visit the property utilizing the easements cannot be constrained by any limitations because the trial court concluded that her right of access is unfettered and because the Agreement does not contain any prohibition against her having friends visit via the easements. However, in light of our conclusion concerning the personal nature of her right of access over the easements, we agree with the trial court's conclusion that Nadine's personal right of access "does not permit [her] to bring invitees onto the easements unless those invitees clearly fit within one of the other specific [provisions in the Agreement]." As a result, the purposes for which invitees may use the easements are limited to those expressly addressed in the Agreement.[11]

one's " 'immediate family' would include spouses and persons related within the second degree of consanguinity or affinity"); *People v. Toledo*, 26 Cal.4th 221, 109 Cal.Rptr.2d 315, 26 P.3d 1051, 1055 n. 3 (2001) (" '[I]mmediate family' means any spouse, whether by marriage or not, parent, child, any person related by consanguinity or affinity within the second degree, or any other person who regularly resides in the household, or who, within the prior six months, regularly resided in the household."). However, where, as here, the parties choose to insert in their agreement a qualifying phrase that limits "immediate family to the first degree of consanguinity," those usually found within the scope of one's immediate family by marriage or affinity, or even by

more distant degrees of consanguinity, have been intentionally excluded.

11. In fact, the Agreement's express treatment of the purposes for which the easements may be used and addressing their use with reference to "Gillmor's invitees" certainly undermines any assertion that the personal benefit of vehicular access given to Gillmor in Section 3(a) gives him an absolute right to welcome unlimited numbers of invitees onto the easements. It is contradictory to say Gillmor's right to bring invitees on the easements is unfettered while the Agreement expressly limits the purposes for which "Gillmor's invitees" may use the easements and expressly limits the number of persons who may use the easements for certain purposes.

¶ 26 Consequently, we affirm the trial court's determination that invitees' use of the easements is limited to the purposes of maintenance, animal husbandry, and hunting [12] under the Agreement—with one exception. The Maceys correctly argue that the trial court erred in ruling that Section 6's express limitation on the number of "persons" that can use the easements "for hunting purposes" was instead a restriction on the number of "hunters" that may use the easements. While the distinction between "hunters" and "persons" using the easements "for hunting purposes" seems insignificant, given Nadine's attempts to broaden her invitees' use of the easements by virtue of her own right of access, it is a meaningful distinction.[13]

¶ 27 Thus, the provision under the heading *"Designation of Use of Easements by Invitees"* that states that "Gillmor ... shall not allow more than 18 persons and six vehicles to use the Easements for hunting purposes at any time" limits the number of "persons" and "vehicles" using the easements for the purpose of hunting and makes no distinction between the person who is actually a licensed hunter with gun in hand and the person who is going along with a hunter just to cook or enjoy the scenery but will not actually hunt.

### B. Cabin Construction

■ ¶ 28 Nadine also argues that the trial court erred by holding that the Agreement restricts her ability to use the easements to build a new cabin on the Gillmor Property because the Agreement does not contain any prohibition against her building a new cabin. She argues that because the Agreement does not expressly say anything about cabin construction, under the general law of easements and real property she has the right to use the easements to construct new structures on the Gillmor property. We disagree. While it is true the Agreement does not directly address the use of the easements for cabin construction, we agree with the trial court's interpretation of the term "maintenance work" as excluding "new construction on the Gillmor property, in the guise of maintenance." Moreover, we conclude that the trial court's Finding of Fact 18 is a correct finding and interpretation of the Agreement, in spite of Nadine's contention that it is unsupported by the evidence.

¶ 29 Finding of Fact 18 states that

Richards['s] intention that Gillmor could use his property as he wished included Gillmor's right to construct additional structures, but Richards absolutely did not intend that Gillmor could use the servient property to aid such construction in any way. The parties did not intend, and the Agreement does not provide, for Gillmor to use the servient property for construction access in any form, such as transportation of building materials or construction workers. The parties did negotiate to allow access for animal husbandry, but that provision was never intended to be construed so broadly as to allow access to construct residential dwellings.

Nadine attacks this finding, asserting an utter absence of evidence on which to base the finding and by presenting evidence to contradict what the trial court concluded. We are not convinced, however, that the marshaled evidence supporting the court's finding suggests that the finding is so lacking in support

12. Although this interpretation may seem silly at first blush, favoring, as it does, the more disruptive hunter, over the more benign birdwatcher or picnicker, it must be noted that hunting was historically the primary use Gillmor made of the property other than grazing livestock. More importantly, the seasonal nature of hunting means that the restriction ends up having an important temporal component. That is, Richards Co. and its successors need only endure the increased traffic and noise of additional invitees during a few weeks out of each year when hunting is legal.

13. Richards and the Maceys also provided an example of why the distinction is significant to curb Nadine's attempts to expand the easements' usage by invitees. They explained that Nadine had "flouted the provision's express limitation of '18 persons' by allowing invitees to nominate themselves as either 'hunters' or 'non-hunters' so that more than 18 people can use the easement." Yet, our interpretation of the limited purposes for which invitees may actually use the easements to access the Gillmor property permits no such thing. Under our interpretation, designating an invitee as a "non-hunter" does not avoid the Agreement's requirement that the invitee be using the easements to access the property for one of the other stated purposes, i.e., maintenance and animal husbandry.

as to be against the clear weight of the evidence. *See Chen v. Stewart,* 2004 UT 82, ¶ 19, 100 P.3d 1177. As a result, we defer to the trial court's assessment of the evidence on this issue.

### C. Use of the Easements by Occupants of the Cabin

■ ¶ 30 Richards Co. and the Maceys contend that the trial court erred by giving the occupants of the cabin on the Gillmor Property a general right of access, as opposed to access subject to the other limitations in the Agreement. We agree. The Agreement states "that there is one cabin on the Gillmor Property, and that the occupant of such cabin shall have the right to use the Easements for access to such cabin." The trial court held that

> [t]he "occupant of such cabin" has general rights of access across the servient estate to access the cabin for any purpose which is consistent with historical use. Historical uses include animal husbandry (specifically including fence maintenance), general recreation (e.g. picnics, camping) and hunting. They do not include access for construction activity on the Gillmor property, and the cabin occupant's access rights may not be used to directly or indirectly increase the access rights of Ms. Gillmor. . . .

¶ 31 The trial court properly determined which "cabin" is referenced in the Agreement and who its "occupant" is. We conclude, however, that when read in the context of the Agreement in its entirety, harmonizing and giving effect to all its provisions, this grant of access to the cabin over the easements is limited by the purposes and limitations set forth throughout the Agreement. The Agreement clearly anticipates that the only uses to which the easements granted will be put to use are for animal husbandry, for maintenance, and for hunting. Thus, while the occupants of the cabin may use the easements to access the cabin, they may do so only if their purpose for reaching the cabin falls within one of the purposes spelled out in the Agreement and subject to other limitations that appear in the Agreement. The court went too far in allowing any purpose consistent with historical use where the Agreement clearly sets forth the exact purposes for which the easements granted in the Agreement may be used.

### D. The Use of Four–Wheeled ATVs on the Easements

■ ¶ 32 Finally, we address the parties' disagreement about the use of four-wheeled ATVs on the easements. Nadine argues on appeal that partial summary judgment should have been granted to her on this issue because the Agreement clearly does not restrict her use of four-wheeled ATVs on the easements. The Agreement states: "Gillmor agrees that he will not allow use of and will not himself use any three-wheeled motorized All Terrain Vehicles or any two-wheeled motorcycles or motorized 'dirt bikes' on the Easement at any time."

¶ 33 Nadine avers that the language within the "four corners" of the Agreement is unambiguous with respect to the terms "two-wheeled motorcycles or motorized 'dirt bikes' " and "three-wheeled motorized All Terrain Vehicles" and that, as a result, the Agreement unambiguously places no restrictions on the use of four-wheeled ATVs on the easements. Nevertheless, we agree with the trial court that the Agreement is ambiguous about whether this language in the Agreement prohibited or allowed the use of four-wheeled ATVs on the easements and, therefore, the motion for partial summary judgment was properly denied. *See Faulkner v. Farnsworth,* 665 P.2d 1292, 1293 (Utah 1983) (stating that "a motion for summary judgment may not be granted if a legal conclusion is reached that an ambiguity exists in the contract and there is a factual issue as to what the parties intended").

■ ¶ 34 Admittedly, when viewed in isolation, the Agreement's plain language would seem to lead to the conclusion that the terms "two-wheeled motorcycles or motorized 'dirt bikes' " and "three-wheeled motorized All Terrain Vehicles" are not at all ambiguous. On its face, the Agreement appears only to limit the use of "two-wheeled motorcycles or motorized 'dirt bikes' " and "three-wheeled motorized All Terrain Vehicles" on the easements; it says nothing of four-wheeled ATVs. Our rules of contract interpretation

require, "[i]f the language within the four corners of the contract is unambiguous," that courts " 'first look to the four corners of the agreement to determine the intentions of the parties ...' from the plain meaning of the contractual language." *Central Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599 (citations omitted). However, Utah law does not strictly require courts to only view the terms of a contract within its *four corners*, according to their *plain meaning*, when making the determination of whether there is an ambiguity in a contract.

■ ¶ 35 Under Utah law, if the initial review of the plain language of a contract, within its four corners, reveals no patently obvious ambiguities, the inquiry into whether an ambiguity exists in a contract does not always end there. Utah's rules of contract interpretation allow courts to consider *any* relevant evidence to determine whether a latent ambiguity exists in contract terms that otherwise appear to be unambiguous. *See Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268 (Utah 1995) ("When determining whether a contract is ambiguous, any relevant evidence must be considered."). *See also Nielsen v. Gold's Gym*, 2003 UT 37, ¶ 7, 78 P.3d 600 (stating that any "[r]elevant, extrinsic evidence 'of the facts known to the parties at the time they entered the [contract]' is admissible to assist the court in determining whether the contract is ambiguous") (second alteration in original) (citation omitted).[14] In adopting this approach to the interpretation of contracts and contract ambiguities, the Utah Supreme Court has reasoned that "[o]therwise, the determination of ambiguity is inherently one-sided, namely, it is based solely on the 'extrinsic evidence of the judge's own linguistic education and experience.' " *Ward*, 907 P.2d at 268 (citations omitted). Therefore,

> [a]lthough the terms of an instrument may seem clear to a particular reader—including a judge—this does not rule out the possibility that the parties chose the language of the agreement to express a different meaning. A judge should therefore consider any credible evidence offered to show the parties' intention.

*Id. See also Nielsen*, 2003 UT 37 at ¶ 7, 78 P.3d 600. Thus, a " '[r]ational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties ... so that the court can "place itself in the same situation in which the parties found themselves at the time of contracting." ' " *Ward*, 907 P.2d at 268 (second alteration in original) (citations omitted).

¶ 36 The present case provides a prime example of the rationale behind Utah's espousal of this approach to contract ambiguities. At first glance, the terms "two-wheeled motorcycles or motorized 'dirt bikes' " and "three-wheeled motorized All Terrain Vehi-

---

**14.** In this regard, Utah case law has rejected the strict application of the "four corners" rule, which limits the boundaries of inquiry into whether an ambiguity exists in a contract to the contract's "four corners" and effectively excludes the evidence of any surrounding circumstances—outside of the writing—that might indicate that the contract language lacks the required degree of clarity. *See, e.g., Oakwood Vill. L.L.C. v. Albertsons, Inc.*, 2004 UT 101, ¶ 17, 104 P.3d 1226 (typifying application of "four corners" rule of contract analysis when written instrument is unambiguous and complete). *See generally* 2 E. Allen Farnsworth, Farnsworth on Contracts, §§ 7.12–7.12a (2d ed.2001) (explaining the four corners rule and the varying degrees of stringency with which it is applied by state courts). Likewise, Utah no longer strictly applies the "parol evidence rule" or the "plain meaning rule," which exclude the use of any parol evidence to show whether a contract's language lacks the required degree of clarity. *See Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268 (Utah 1995) ("While there is Utah case law that espouses a stricter application of the [parol evidence] rule and would restrict a determination of whether ambiguity exists to a judge's determination of the meaning of the terms of the writing itself, [see, e.g., Bakowski v. Mountain States Steel, Inc., 2002 UT 62, ¶ 16, 52 P.3d 1179,] the better-reasoned approach is to consider the writing in light of the surrounding circumstances."). *See generally* 2 Farnsworth § 7.12; 5 Margaret N. Kniffin, Corbin on Contracts § 24.7 (rev. ed.1998) (discussing the various views courts have on how the parol evidence and plain meaning rules should be applied in contract interpretation). Instead, Utah law has made these rules of interpretation just part of the initial inquiry to determine whether an ambiguity exists in contract language. They are no longer the determinative rules they once were when parties asserted that a contract contained ambiguities. *See Ward*, 907 P.2d at 268; *Nielsen v. Gold's Gym*, 2003 UT 37, ¶ 7, 78 P.3d 600.

cles" do not include four-wheeled ATVs. Nevertheless, by considering evidence of the circumstances surrounding the creation of the Agreement in 1985, it becomes clear that the Agreement is ambiguous as concerns the use of four-wheeled ATVs on the easements.

¶ 37 The evidence before the court on summary judgment indicates, for example, that the parties were aware of Richards's intention to limit the use of all-types of ATVs or dirt bikes on the easements because they caused noise and dust, and that four-wheeled ATVs were new and novel enough that the parties were unaware of their existence at the time they entered into the Agreement. This evidence calls into question the clarity and precision of the terms used to express this limitation on the use of the easements, so as to survive partial summary judgment. At the very least, the evidence lends credence to the interpretation that Richards and the Maceys seek to give this language.[15] The revelation of such ambiguity in the contract demanded the introduction of evidence outside of the agreement in order to allow the trial court to determine the parties' intentions. As a result, summary judgment on this issue was not appropriate and the court properly admitted extrinsic evidence to help it deduce the intentions of the parties as concerns the use of ATVs on the easements.

¶ 38 Therefore, once a contract is correctly determined to be ambiguous in some respect "and the trial court proceeds to find facts respecting the intentions of the parties based on extrinsic evidence, then our review is strictly limited." *Peterson v. Sunrider Corp.*, 2002 UT 43, ¶ 14, 48 P.3d 918 (internal quotations and citations omitted). This is because the court's determination as to the parties intended meaning, based on the evidence presented to the court, becomes a question of fact to be determined by extrinsic evidence of intent. *See id.* The court then makes the appropriate findings of fact in support of its conclusions. So long as the trial court's findings of fact are sufficiently supported by the evidence and not clearly erroneous, we give great deference to a court's findings, giving due regard to the trial court's favorable position for weighing issues of witness and evidence credibility. *See Young v. Young*, 1999 UT 38, ¶ 15, 979 P.2d 338. *See also* Utah R. Civ. P. 52(a) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses.").[16]

¶ 39 Nadine challenges the evidence supporting two of the trial court's factual findings concerning the parties' intentions on the use of four-wheeled ATVs on the easements.

---

15. We hasten to add that another overarching principle concerning contract ambiguities is the touchstone that "the contrary positions of the parties must each be tenable." *Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990). While it is true that "[a] contract provision is ambiguous if it is capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms or other facial deficiencies,'" *Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991) (citation omitted), "a contract provision is not necessarily ambiguous just because one party gives that provision a different meaning than another party does." *Plateau Mining Co.*, 802 P.2d at 725. Both sides' contentions concerning the use of four-wheeled ATVs on the easements are, in fact, tenable.

16. Nadine urges us to construe the Agreement most strongly against Richards, as the grantor of the easement, construing it instead most favorably to Frank, as the grantee, and her, as Frank's successor. While "[i]t is generally conceded that a *deed* is to be construed most strongly against the grantor, and most favorably to the grantee,"

*Wood v. Ashby*, 122 Utah 580, 253 P.2d 351, 353 (1952) (emphasis added), the case before us does not present the more typical situation where the instrument granting an easement is, in fact, a deed. Instead, what we have before us is a contractual agreement reached in settlement of the parties' opposing claims concerning two roadways—not a grant of an easement by deed. As a result, the more applicable interpretive principle is the doctrine of construing ambiguities in a contract against the drafter. *See Wilburn v. Interstate Elec.*, 748 P.2d 582, 585–86 (Utah Ct. App.1988). However, that doctrine only comes into play "as a kind of tie-breaker, used as a last resort by the fact-finder after the receipt and consideration of all pertinent extrinsic evidence has left unresolved what the parties actually intended." *Id.* at 585. The doctrine is inapplicable in this case in any event, as the Agreement was not drafted by one party alone, but is the product of several drafts that were exchanged between attorneys until a mutually satisfactory final agreement was created.

Nevertheless our review reveals that the trial court's findings of fact are sufficiently supported by the evidence and, therefore, are not clearly erroneous. *See Young*, 1999 UT 38 at ¶ 15, 979 P.2d 338. *See also* Utah R. Civ. P. 52(a). First, there is adequate evidence to support the trial court's Findings of Fact No. 23:

> Dirt bikes (two-wheeled motorcycles) and three wheel ATVs were used on the Gillmor and servient properties by the Howard group before the Agreement was signed. Tom Howard bought and used his first four wheel ATV in the Spring of 1985 and his father, Vernon, and Tom's brother, Craig, each bought his first four wheel ATV in October, 1985, about one month before the Agreement was signed. There is no evidence that either Frank Gillmor or David Richards were aware of the use of the four wheelers before they signed the Agreement. Four wheel ATVs were relatively rare in 1984–85, but they completely replaced three wheel ATVs by 1988.

¶ 40 For example, James Elegante, the attorney who negotiated the Agreement for Frank; Ross Workman, Richards's attorney at the time of the Agreement; and Richards himself, all testified that they were not aware of four-wheeled ATVs at the time of the Agreement in 1985. Mr. Elegante even went so far as to say that Frank had not affirmatively expressed to him any intent to reserve the right to use four-wheeled ATVs and that if four-wheeled ATVs had been common they would have somehow been dealt with in the Agreement. Nadine, on the other hand, contends that the letters Tom and Vern Howard sent to Frank Gillmor which mention the Howard's use of "four-tracks," or their thoughts on buying "four-tracks," and the testimony of Tom and Craig Howard that they purchased four-wheeled ATVs and used them on the Gillmor property in the early 1980s give rise to the inference that Frank knew that four-wheeled ATVs existed, which runs contrary to the court's finding. We are satisfied that the trial court found the recollections of Mr. Elegante, Mr. Workman, and Richards more credible than the testimony and evidence Nadine relies on to attack this finding, and, thus, did not accord her evidence much weight in determining the intentions of the parties, which it is in the best position to do. The trial court's finding is, therefore, not clearly erroneous.

¶ 41 Likewise, the trial court's Finding of Fact No. 26 is sufficiently supported by the evidence so as to not render it clearly erroneous. The finding states in part

> that the only reason four wheel ATVs were not expressly prohibited is because they were relatively new and unknown to the parties, or at a minimum, they were not consciously distinguished from "three wheelers." Both parties, however, intended to exclude all terrain vehicles that could, because of their maneuverability and other characteristics, too readily depart from the established roads; and because, whether on or off the roads, they contributed to the noise and dust concerns clearly voiced by Richards.

Here again, the trial court was obviously more persuaded by the evidence and testimony that indicated that four-wheeled ATVs were unknown to the parties at the time they entered into the Agreement, that Frank Gillmor had not affirmatively manifested to his attorney an intent to reserve the right to use four-wheeled ATVs on the easements, that had four-wheeled ATVs been more common they would have been dealt with expressly in the Agreement,[17] and that the phrase "three-wheeled" ATVs in the Agreement was intended to be a general term for all off-road vehicles other than motorcycles, rather than to reflect an irrational preoccupation with the number of tires an off-road vehicle had. Significantly, there is no evidence in the record suggesting that four-wheeled ATVs are quieter or generate less dust than three-wheeled ATVs. As a result, we also conclude this finding of fact is not clearly erroneous.

---

17. While the Agreement was signed in 1985, "[s]afety issues with 3 wheels caused all manufacturers [of ATVs] to switch to 4–wheeled models in the late 80's[.]" Facts about ATV, at *http://www.atv. info/page.cfm? name=ATV˜Facts* (last visited August 9, 2005). *See* Bill McAllister, *5 Firms Agree to Stop Selling 3–Wheel All Terrain Vehicles*, The Washington Post, Dec. 31, 1987, at A1 ("The five firms that have sold the more than 2.3 million all terrain vehicles (ATVs) in use in this country agreed yesterday to stop selling the three-wheeled models[.]").

¶ 42 In sum, we conclude that the evidence adequately supports the trial court's findings of fact on the issue of whether the parties intended that four-wheeled ATVs could be used on the easements. Such findings are, therefore, not clearly erroneous. We affirm the trial court's conclusion that the Agreement prohibits anyone's use of four-wheeled ATVs, right along with dirt bikes and three-wheeled ATVs, on the easements.[18]

## CONCLUSION

 ¶ 43 Although Nadine has a right to use the easements to access the Gillmor property, her right is personal and cannot be used to enlarge the limited purposes for which the easements can be used as set forth in the Agreement. Consequently, her ability to use the easements for construction purposes and to host invitees is limited by the Agreement. We also conclude that the Agreement itself places clear limitations on the purposes and uses for which the easements can be put to use by the occupant of the cabin. Finally, we agree with the trial court's conclusion that four-wheeled ATVs are excluded from use on the easements.[19]

¶ 44 Except as otherwise indicated herein, we affirm.

¶ 45 WE CONCUR: RUSSELL W. BENCH, Associate Presiding Judge and NORMAN H. JACKSON, Judge.

---

18. Nadine's argument that the trial court failed to address her assertion that the doctrine of practical construction compels the conclusion that four-wheeled ATVs are not prohibited under the Agreement is without merit. While it is true the court did not address this argument in its written findings of fact and conclusions of law, the court explained from the bench its reasoning for rejecting Nadine's argument, and the evidence that supported its conclusion, during a hearing at which the trial court rejected entirely Nadine's motion to alter or amend the judgment. A trial court's findings and conclusions also include any explanations given from the bench. Our review of the record shows that the trial court did consider this argument and was persuaded by the evidence that the doctrine did not apply. We likewise concluded that the trial court's rejection of this argument was warranted. Nadine also contends that the trial court reformed the Agreement under the guise of interpreting the Agreement. She argues that because the grant of access to the occupant of the cabin, the grant of access to Gillmor, and the language concerning the use of "dirt bikes" and "three-wheeled motorized All Terrain Vehicles" are all clear on the face of the Agreement, the trial court's interpretation of those aspects of the Agreement amounted to a virtual reformation of the Agreement. Because we conclude that there were ambiguities with respect to some of these terms and that, as to others, the trial court's interpretation of the unambiguous language was correct as a matter of law, we reject Nadine's assertion that the trial court's action amounted to a de facto reformation of the Agreement.

19. We reject Nadine's assertion that the trial court's judgment amounts to an advisory opinion with respect to the use of the easement by corporate successors, the convoying of vehicles on the easement, the construction of new structures on the Gillmor property by successors in interest, and the presumptive limits for the number of hunters on the Gillmor property. She essentially claims these issues were not ripe for adjudication because nothing has occurred to raise these issues and there was no evidence to indicate any intention by Nadine to do anything that would raise these issues. We disagree. Nadine herself properly put these issues before the trial court when she brought her action under Utah Code sections 78-33-1 to -13 and sought a declaration of her rights, status, and legal relationship as against the Maceys under the Agreement. *See* Utah Code Ann. §§ 78-33-1 to -13 (2002). In fact, her original complaint sought to declare her rights as concerns *any* uses of the easements she was allowed under the Agreement in order to prevent the Maceys from restricting or prohibiting her rights. Moreover, our review of the record shows that the parties either raised the issues and presented evidence to the court so that there was an "actual controversy," or that given the current dispute between the parties over the use of the easements, there is at least a substantial likelihood that a dispute over these issues will develop so that the adjudication serves a useful purpose in resolving or avoiding controversy or future litigation. *See Salt Lake County Comm'n v. Short,* 1999 UT 73, ¶ 12, 985 P.2d 899.