2020 UT App 38

# THE UTAH COURT OF APPEALS

MELANIE MADSEN THATCHER,
Appellee and Cross-appellant,

*v.*

MICHAEL LANG,
Appellant and Cross-appellee.

Opinion
No. 20180009-CA
Filed March 12, 2020

Fifth District Court, St. George Department
The Honorable G. Michael Westfall
No. 120500520

Karra J. Porter, Kristen C. Kiburtz, and,
J.D. Lauritzen, Attorneys for Appellee and
Cross-appellant

Bryan J. Pattison and Elijah L. Milne, Attorneys for
Appellant and Cross-appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and JILL M. POHLMAN concurred.

MORTENSEN, Judge:

¶1 This is a dispute about a $1.8 million real estate purchase contract (Contract) gone sour. After the purchase fell through, the trial court ruled that (1) Michael Lang (Buyer) was not entitled to specific performance, (2) Melanie Madsen Thatcher (Seller) was entitled to have title quieted in her favor, (3) Seller was not entitled to liquidated damages, and (4) Buyer could recover a portion of the principal and interest payments he made to Seller under a theory of unjust enrichment. We affirm on the issues of specific performance and liquidated damages, but reverse and remand on the issues of quiet title and unjust enrichment.

## BACKGROUND[1]

¶2 This dispute arises from a real estate transaction concerning approximately nineteen acres of land located in Springdale, Utah (Property). In February 2006, Buyer and Seller entered into an option agreement (Option) granting Buyer the exclusive right to purchase the Property. In May 2006, Buyer exercised the Option, and the parties entered into the Contract wherein Buyer agreed to buy, and Seller agreed to sell, the Property for $1,800,000 (Purchase Price). The Purchase Price was originally payable as follows: $50,000 non-refundable option payment to be applied as principal; $100,000[2] due on May 1, 2006; $400,000 due on July 5, 2006; $600,000 due on January 5, 2007; and $650,000 due at closing on or before January 5, 2008.

---

1. "On appeal from a bench trial, findings of fact shall not be set aside unless clearly erroneous, and . . . we relate the facts accordingly, granting due deference to the trial court's resolution of factual disputes." *Armed Forces Ins. Exch. v. Harrison*, 2003 UT 14, ¶ 2, 70 P.3d 35 (cleaned up).

2. The Option designated the $50,000 and $100,000 payments as non-refundable. However, in an addendum to the Option, only the $50,000 payment was designated as non-refundable—not the $100,000 payment. The Contract similarly designates the $50,000 option payment as non-refundable, but not the $100,000 payment. The Contract further provides, "The terms of the Option . . . have been merged herein and to the extent any terms or conditions of the Option . . . conflict or are otherwise inconsistent with this [Contract], the terms of this [Contract] shall control." Thus, because the refundability designation of the $100,000 is inconsistent between the Option and the Contract, the Contract governs and the $100,000 payment does not carry the non-refundable designation.

¶3 The Contract contained specific provisions governing default by either party. In the event of Seller's default, Buyer's contractual remedy was provided by section 4.3 of the Contract (Seller Default Clause):

> 4.3 <u>Seller Default</u>. Upon thirty (30) days prior notification in writing by Buyer to Seller of any material breach of the representations, warranties and covenants of Seller set forth in this Section 4 or elsewhere in this Agreement, Seller, at Seller's own expense, shall cure or remedy any such breach of such representations, warranties and covenants. If Seller fails within thirty (30) days following Buyer's notice thereof to cure or otherwise remedy the breach, Buyer may terminate this Agreement upon notice to Seller. With respect to any cloud on title that may be cured by payment of cash at Closing, Seller shall have until Closing to cure such cloud. In such event, any sums paid by Buyer to Seller shall be returned to Buyer except for the initial $50,000 payment referenced in Section 1.2(a). Nothing contained in this Section shall be construed to require Buyer to postpone the Closing, or to limit or preclude the recovery by Buyer against Seller of any sums for damages to which Buyer may lawfully be entitled, or the exercise by Buyer of any equitable rights or remedies, including, without limitation, the remedy of specific performance, to which Buyer may lawfully be entitled by reason of any material breach of any of the representations, warranties or covenants of Seller set forth in this Agreement.

Conversely, in the event of Buyer's default, Seller's contractual remedy was provided by section 4.4 of the Contract (Buyer Default Clause):

4.4 <u>Buyer Default</u>. Seller may terminate this Agreement by giving written notice to Buyer if Buyer materially breaches any covenant or other obligation of Buyer under this Agreement and fails to cure such breach within thirty (30) days after written notice from Seller is received by Buyer specifying such breach. If Buyer fails to make payment on or before any deadline provided for herein after the expiration of thirty (30) day grace period, all payment previously made shall be forfeited to Seller as liquidated damages.

¶4    In December 2006, the parties amended the Contract. At the time, Buyer had paid the first $550,000, less $12,500 due to a misunderstanding between the parties. The amendment required Buyer to pay the delinquent $12,500 plus $125,000—both to be applied to the Purchase Price—by January 5, 2007. A final payment of $1,125,000 would be due by the original closing date of January 7, 2008. In return for Seller excusing the third-scheduled payment of $600,000, Buyer also agreed to pay $101,250 in interest—amounting to 9% interest on the outstanding Purchase Price. Buyer paid Seller the agreed-upon installment and interest payments, leaving a principal balance of $1,125,000 due on or before January 7, 2008.

¶5    On September 13, 2007, the parties amended the Contract again. This amendment provided that (1) the closing date could be delayed up to five years, until January 10, 2013 (Effective Closing Date); (2) Buyer was required to make principal payments of $50,000—due within ten days of signing the amendment—and $75,000—due by December 23, 2007; and (3) beginning January 10, 2008, Buyer would make $10,000 monthly interest payments until he closed on the Property. The parties executed the amendment, and Buyer paid the $50,000 and $75,000 principal payments—leaving a principal balance of $1,000,000 due on or before closing.

¶6     Buyer struggled to stay current on the monthly interest payments. In September 2010, Buyer's interest payment was a week late. He was late again the following month, at which time he secured a loan. From the loan, he used $40,000 to pay the delinquent October 2010 interest payment and prepay the next three months. But by October 2011, Buyer was behind on interest payments again.

¶7     On December 5, 2011, Seller sent Buyer a written notice of default (First Notice). Seller's First Notice explained that Buyer was behind on interest payments, property taxes, and other assessments which were his responsibility under the Contract. Specifically, the First Notice stated,

> This is a notice of breach and request to cure all breaches . . . including payment in full of all Washington County taxes and other assessments past due and owing on [the Property]. Public information on the taxes due . . . is attached herewith.
>
> You are currently, once again, late on your monthly payment. . . . This includes city and county assessments. . . .
>
> In addition, Seller requests reimbursement for water, sewer and other city assessments she paid during 2006–2008 which were Buyer's responsibility to pay. An invoice of payments and dates will follow.
>
> Please note that you are currently in default pursuant to Clause 11 of the Option now merged with [the Contract] and Clause 4.4 of [the Contract] on scheduled payment and nearing the thirtieth (30th) day of delinquency.

Buyer attempted to negotiate an extension on the overdue payments, but Seller refused. Strapped for cash, Buyer obtained a second loan. With those funds in hand, Buyer timely cured the defaults identified in the First Notice.

¶8    As of February 2, 2012, Buyer was current on all payments due under the Contract, and he was planning to secure financing that would enable him to close on the Property. On February 9, 2012, Buyer's attorney wrote Seller asking that she be prepared to close on the Property by March 10, 2012. On February 21, 2012, Buyer again contacted Seller, stating that he had the required amount of "money together"[3] and wanted to close by March 15, 2012. Seller responded that she disagreed with Buyer about the total amount due at closing but nonetheless indicated that she would be willing to close anytime before March 8, 2012, because she planned to leave the country on that date. Buyer was unable to secure financing by March 8, 2012; Seller left the country, and the parties agreed to close at some point after her return.

¶9    Over the ensuing months, the parties quibbled about the total amount due at closing. Then, on April 23, 2012, Buyer informed his attorney, who in turn informed Seller, that if Buyer did not receive certain accounting information from Seller by the following day, he would "start[] every legal procedure possible" and that Seller "would not believe the damages if she did not comply with his demands." The following day, Seller initiated a

---

3. Whether Buyer actually had the "money together" for closing was hotly contested. However, because Buyer's failure to timely make interest payments under the Contract undermined his claim for specific performance, *infra* ¶¶ 24–25, his ability or willingness to tender in 2012, or at any other time, is not a determinative factor as to whether the trial court properly denied specific performance.

lawsuit against Buyer, incorrectly alleging that Buyer had "not been current since October 10, 2011," and requested that the court quiet title to the Property in her favor (Lawsuit-1). Seller never served Buyer with Lawsuit-1.[4]

¶10    Despite their respective posturing, the parties continued to work toward a closing. However, a closing tentatively scheduled for April 26, 2012, fell through because Buyer "never tendered payment of the amount he claimed was due, . . . was behind on his monthly payments, . . . had not yet completed due diligence items, . . . and . . . was involved in litigation" concerning the zoning designation of the Property. Another tentative closing, scheduled for May 4, 2012, fell through because Buyer did not tender the amount due by that date.

¶11    On July 1, 2012, Seller mailed a second notice of default (Second Notice) to Buyer stating,

> As you are aware, you are now, and have been for many months, in default and breach of the [C]ontract for purchase of [the Property].
>
> This is not your first notice, and you have previously received written notice pursuant to the [C]ontract.
>
> Although you have defaulted, I expected to hear from you concerning my willingness to allow you to cure the default, but I have not.

---

4. The trial court would later rule that "[t]he filing of [Lawsuit-1] was not a repudiation of the [C]ontract or a breach of the same but was, instead, a misguided effort to secure jurisdiction in Utah" and was in response to Buyer's threat to initiate legal action.

Buyer did not make any payments or respond to the Second Notice.

¶12   On August 13, 2012, Seller mailed a notice of forfeiture to Buyer. Therein, Seller indicated that she believed that Buyer had failed to cure within thirty days of receiving the Second Notice, and therefore the Contract was terminated and he needed to remove his notice of interest and any liens or lis pendens associated with the Property.

¶13   On August 28, 2012, Seller filed the current action (Lawsuit-2) and requested, among other things, that the trial court quiet title to the Property in her favor. Buyer filed a counterclaim for breach of contract, requesting that the court order specific performance and, alternatively, for unjust enrichment, requesting that the court order Seller to return all principal payments ($800,000) and interest payments ($671,250) to Buyer.

¶14   Importantly, during this time period, Buyer withheld interest and other payments due under the Contract. In fact, Buyer did not make any interest payments to Seller after February 2012, and the court found that "[Buyer's] failure to tender any further payments to [Seller] . . . was not reasonable" and that "some of [Buyer's] written communications indicate that he was deliberately withholding payments as leverage to get [Seller] to give him certain information."

¶15   In November and December 2015, the court held a seven-day bench trial. The court initially ruled that Seller committed the first material breach—on the ground that Seller's actions prevented Buyer from obtaining financing—and ordered specific performance of the Contract. The parties subsequently filed various motions to alter or amend the court's findings and conclusions.

¶16 In considering the parties' post-trial motions, the court reviewed the evidence and exhibits and determined that its prior findings and conclusions should be amended. Specifically, the court stated, "In reaching its previous [f]indings and [c]onclusions, the court overlooked [an] exhibit" demonstrating that for Buyer to obtain the necessary financing to close, "a recent appraisal showing $2,450,000 on [the Property]" was required. The court further found that "although [Buyer] had obtained an appraisal (dated January 10, 2012) showing the requisite value for [the Property], the value shown on the first appraisal was based in part on [the Property] being zoned for commercial use." (Cleaned up.) Thus, where Buyer "had . . . lost the favorable commercial rezoning for [the Property], . . . this court cannot determine that . . . [Buyer] would have been able to obtain financing."

¶17 In its amended conclusions of law, the court ruled that "[Buyer] not only failed to tender the principal amount which he knew was due, he failed to tender any interest payments that he knew were due until the deadline for his performance in January 2013. His failure to tender anything, under the circumstances of this case, precludes" his request for specific performance. And "[a]lthough [Buyer] has argued that [Seller's] actions prevented and excused his tender . . . the court cannot agree."

¶18 Based on its amended findings, the court ruled that (1) neither party could recover under their claims for breach of contract; (2) Buyer was not entitled to specific performance; (3) Seller's Second Notice was deficient, and therefore she could not terminate the Contract and retain all previously made principal payments as liquidated damages; and (4) Buyer was entitled to recover $800,000 in principal payments from Seller under a theory of unjust enrichment.

¶19    Both parties appeal.[5]

ISSUES AND STANDARDS OF REVIEW

¶20    Four issues are raised on appeal, two by Buyer and two by Seller. First, Buyer claims that the trial court erred in denying specific performance of the Contract. "Specific performance is a remedy of equity . . . and accordingly, considerable latitude of discretion is allowed in determination as to whether it shall be granted and what judgment should be entered in respect thereto; and ruling thereon should not be upset on appeal unless it clearly appears that [the court] has abused [its] discretion." *Carr v. Enoch Smith Co.*, 781 P.2d 1292, 1294 (Utah Ct. App. 1989) (cleaned up).

¶21    Second, Buyer contends that the trial court erred in quieting title in favor of Seller. "Determination of the proper scope of a quiet title action presents a legal question that we review for correctness." *Haynes Land & Livestock Co. v. Jacob Family Chalk Creek, LLC*, 2010 UT App 112, ¶ 8, 233 P.3d 529; *see also Salt Lake City v. Silver Fork Pipeline Corp.*, 2000 UT 3, ¶ 18, 5 P.3d 1206 ("A quiet title action requires the application of a rule of law to decide ownership of the property in question."),

---

5. Neither party has challenged the court's amended findings of fact, nor has either challenged the propriety of the court amending its findings and conclusions, which essentially reversed the court's prior ruling and order for specific performance. Further, the court indicated that its amended findings and conclusions overruled the prior findings and conclusions with exception only to the procedural history. Thus, our review of this matter is limited to the facts and conclusions as stated in the trial court's amended order. *See Bailey–Allen Co. v. Kurzet*, 945 P.2d 180, 185–86 (Utah Ct. App. 1997).

*overruled on other grounds by Jensen v. Jones*, 2011 UT 67, 270 P.3d 425.

¶22    Third, Seller claims that the trial court erred in ruling that the Second Notice to Buyer was deficient and in deciding in turn to deem the Contract terminated and not to enforce the liquidated damages provision under the Buyer Default Clause. "'[Q]uestions of contract interpretation not requiring resort to extrinsic evidence are matters of law, which we review for correctness.'" *Fort Pierce Indus. Park Phases II, III & IV Owners Ass'n v. Shakespeare*, 2016 UT 28, ¶ 15, 379 P.3d 1218 (quoting *Fairbourn Commercial, Inc. v. American Housing Partners, Inc.*, 2004 UT 54, ¶ 6, 94 P.3d 292).

¶23    Fourth, Seller contends that the trial court erred in granting Buyer relief under a theory of unjust enrichment. "Claims based on equitable doctrines are mixed questions of fact and law. Accordingly, we defer to a trial court's factual findings unless there is clear error but review its legal conclusions for correctness." *Cottonwood Improvement Dist. v. Qwest Corp.*, 2013 UT App 24, ¶ 2, 296 P.3d 754 (cleaned up).

ANALYSIS

I. Specific Performance

¶24    As a general rule, a party seeking specific performance "must make a tender of his own agreed performance in order to put the other party in default." *PDQ Lube Center, Inc. v. Huber*, 949 P.2d 792, 799 (Utah Ct. App. 1997) (cleaned up); *see also Century 21 All W. Real Estate & Inv. Inc. v. Webb*, 645 P.2d 52, 56 (Utah 1982). However, "'an action for specific performance may also be maintained if the plaintiff presents an excuse for his failure to make such payment or tender and avers his ability, readiness and willingness to pay the contract amount.'" *PDQ Lube Center, Inc.*, 949 P.2d at 799 (quoting *Reed v. Alvey*, 610 P.2d

1374, 1379 (Utah 1980)). Importantly, even if a party could hypothetically "surmount the no tender hurdle" to be granted specific performance, that party "must have clean hands . . . . That is, he must take care to discharge his own duties under the contract." *Carr v. Enoch Smith Co.*, 781 P.2d 1292, 1295 (Utah Ct. App. 1989) (cleaned up).

¶25   Here, the trial court denied Buyer's request for specific performance because Buyer had tainted hands. Among other things, Buyer stopped making interest payments in February 2012—prior to the filing of both Lawsuit-1 and Lawsuit-2—and never made a single payment thereafter. And while Buyer argues that he was excused from tendering the outstanding principal due to Seller's actions, he does not address, discuss, or justify his failure to make the interest payments as they became due. Even if Buyer could persuade us that he was excused from tendering the outstanding principal, he has failed to show that he otherwise discharged his duties under the Contract and is entitled to an award of specific performance. *Id.*; *see also Fischer v. Johnson*, 525 P.2d 45, 46 (Utah 1974). Thus, we conclude that the trial court did not exceed its discretion in denying Buyer's claim for specific performance.

## II. Quiet Title

¶26   Generally, "to succeed in an action to quiet title to real estate, a plaintiff must prevail on the strength of his own claim to title and not on the weakness of a defendant's title or even its total lack of title." *Collard v. Nagle Constr., Inc.*, 2002 UT App 306, ¶ 18, 57 P.3d 603 (cleaned up); *see also WDIS, LLC v. Hi-Country Estates Homeowners Ass'n*, 2019 UT 45, ¶ 42 n.73, 449 P.3d 171 ("One seeking to quiet title must allege title, entitlement to possession, and that the estate or interest claimed by others is adverse or hostile to the alleged claims of title or interest." (cleaned up)).

¶27   Here, the trial court made no findings or conclusions concerning Seller's claim to title. If the court's quiet title judgment were now before us for review and definitive resolution, the absence of required findings and conclusions about Seller's claim to title would likely necessitate remand for those findings and conclusions to be made. *Hill v. Estate of Allred*, 2009 UT 28, ¶ 59, 216 P.3d 929 ("Failure of the trial court to make findings on all material issues is reversible error." (cleaned up)); *Interstate Income Props., Inc. v. La Jolla Loans, Inc.*, 2011 UT App 188, ¶ 13, 257 P.3d 1073. But in the posture of this appeal and given our remand for the court's further consideration of remedies and the status of the parties' contract, the question of quieting title is premature. Seller's entitlement to have her title quieted as against Buyer will largely be a function of the trial court's resolution of those other matters on remand. If, for example, the court determines that Buyer's contractual rights are at an end, then findings, conclusions, and a judgment quieting title in favor of Seller would likely follow rather automatically. If, however, the court determines that Buyer has continued contractual rights that could culminate in Buyer's acquiring the Property after all, a quiet title determination would turn on whether Buyer performed or failed to perform his obligations under the revitalized contract. Thus, we reverse and remand on this issue for further proceedings.

### III. Liquidated Damages

¶28   Turning to Seller's appeal, she argues that the trial court erred in ruling that the Second Notice to Buyer was deficient and in concluding in turn that she was not entitled to retain Buyer's principal payments as liquidated damages. Alternatively, Seller argues that even if the Second Notice was deficient, the liquidated damages provision is self-executing and did not require that she provide written notice to Buyer of his failure to make timely payment. We examine both arguments.

A.    Notice and termination are prerequisites to recover liquidated damages.

¶29    The Buyer Default Clause contains two sentences:

> Seller may terminate this [Contract] by giving written notice to Buyer if Buyer materially breaches any covenant or other obligation of Buyer under this [Contract] and fails to cure such breach within thirty (30) days after written notice from Seller is received by Buyer specifying such breach [(Termination Sentence)]. If Buyer fails to make payment on or before any deadline provided for herein after the expiration of thirty (30) day grace period, all payment previously made shall be forfeited to Seller as liquidated damages [(LD Sentence)].

¶30    Seller argues that the Termination Sentence and the LD Sentence are autonomous. In other words, Seller argues that the LD Sentence is self-executing and therefore no notice of breach or termination of the Contract is required to retain Buyer's principal payments as liquidated damages if a subsequent payment is late. Conversely, Buyer argues that the sentences are related and that Seller was required to satisfy requirements of the Termination Sentence to trigger the liquidated damages remedy. We agree with Buyer.

¶31    "As with any contract, we determine what the parties have agreed upon by looking first to the plain language within the four corners of the document." *Peterson & Simpson v. IHC Health Services, Inc.*, 2009 UT 54, ¶ 13, 217 P.3d 716 (cleaned up). "When interpreting the plain language, we look for a reading that harmonizes the provisions and avoids rendering any provision meaningless." *Id.* (cleaned up). "Harmonizing conflicting or apparently ambiguous contract language before

concluding that provisions are actually ambiguous is an important step in the hierarchy of rules for contract interpretation." *Gillmor v. Macey*, 2005 UT App 351, ¶ 19, 121 P.3d 57. Accordingly, we "must first attempt to harmonize all of the contract's provisions and all of its terms when determining whether the plain language of the contract is ambiguous." *Id.* (cleaned up). "To harmonize the provisions of a contract, we examine the entire contract and all of its parts in relation to each other and give a reasonable construction of the contract as a whole to determine the parties' intent." *Id.* (cleaned up).

¶32     In isolation, the LD Sentence may appear to be self-executing. But that sentence does not exist in isolation; rather, it is an integrated part of the two-sentence Buyer Default Clause. Properly harmonizing the Termination Sentence and LD Sentence shows that the parties' intended purpose of the first is to operate as a prerequisite for the second. Most obvious is that the two sentences are combined together in the Buyer Default Clause. This construction is not merely coincidental. The original Option, expressly acknowledged by and appended to the Contract, contained a liquidated damages provision but *did not* contain a termination provision. Thus, it is reasonable to conclude that the parties not only intended to add the Termination Sentence into the Contract, but that the parties intended to add the provision exactly where and how they did.[6]

---

6. As discussed, *supra* ¶ 2 n.2, the Contract provides, "The terms of the Option . . . have been merged herein and to the extent any terms or conditions of the Option . . . conflict or are otherwise inconsistent with this [Contract], the terms of this [Contract] shall control." Under the controlling Contract, the Buyer Default Clause plainly is operative. Accordingly, we conclude that the existence of a self-executing liquidated damages clause in the

(continued…)

¶33　Next, the LD Sentence expressly references a thirty-day grace period; and other than the immediately preceding Termination Sentence, there are no other provisions in the Contract that delineate a thirty-day grace period. Accordingly, it is reasonable to conclude that the parties intended to connect the two sentences vis-à-vis the reference to the thirty-day grace period.

¶34　Further, reading the two in tandem gives effect to "all of the [C]ontract's provisions and *all of its terms*." *See Selvig v. Blockbuster Enters., LC*, 2011 UT 39, ¶ 23, 266 P.3d 691 (emphasis added) (cleaned up). In the event that Buyer is delinquent, Seller has two options: (1) declare the Contract terminated, including her obligation to transfer the Property, and retain the principal payments as liquidated damages for Buyer's breach, or (2) choose *not* to terminate the Contract, in which case she may still retain the principal payments, just as she would have had there been no breach, but she must also eventually transfer the Property after all the payments have been made. In other words, if Seller does not terminate the Contract, she is already entitled to retain the principal payments, but her obligation to transfer the Property remains. Thus, it is only the termination of the Contract that triggers the LD Sentence, and to terminate the Contract proper notice must be given.

¶35　Accordingly, we conclude that when the two sentences at issue are properly harmonized, Buyer's interpretation provides a clear and precise understanding to the Buyer Default Clause, gives logical meaning and effect to the two sentences, and resolves any conflict, without having to resort to extrinsic

---

(…continued)

Option does not lend support to Seller's position that the LD Sentence in the Contract is also self-executing.

evidence to ascertain the intent of the parties. *See Peterson & Simpson*, 2009 UT 54, ¶¶ 13, 19.

B.     Seller's Second Notice was deficient.

¶36     Next, Seller argues that her Second Notice satisfied the Termination Sentence, thereby triggering the LD Sentence. But again, we disagree. The Termination Sentence provides that sufficient notice to terminate the Contract requires a material breach by Buyer and that "written notice from Seller is received by Buyer *specifying such breach*." (Emphasis added.) While the parties disagree about what the phrase "specifying such breach" means, *any* reasonable reading of the Termination Sentence, under a plain language analysis, requires that *some* specific breach be identified. And here there is nothing. The Second Notice from Seller to Buyer states, "As you are aware, you are now, and have been for many months, in default and breach of the [C]ontract for purchase of [the Property]. This is not your first notice, and you have previously received written notice pursuant to the [C]ontract." And "[a]lthough you have defaulted, I expected to hear from you concerning my willingness to allow you to cure the default, but I have not."

¶37     Simply put, this Second Notice does not specify Buyer's alleged breach(es). It contains no specific reference to any particular delinquent principal payment, interest payment, or tax payment. Nor does it explain or describe any amount—much less an overdue amount—that Buyer needed to pay in order to cure. Indeed, the Second Notice notes only that Buyer had "previously received written notice" of his "default and breach" in the First Notice. Buyer, however, cured the breaches listed in the First Notice. Thus, reference to the First Notice did not provide Buyer with *specific* notice of any subsequent breach(es), and therefore Buyer was not given an opportunity to cure after receiving notice of default (as no specific breach was listed). We therefore conclude that under the plain language of the Contract,

the Second Notice did not terminate the Contract or trigger the LD Sentence.[7]

## IV. Unjust Enrichment

¶38 Next, Seller argues that the trial court erred in permitting Buyer to advance and succeed on his unjust enrichment claim. Because we cannot ascertain the ultimate legal basis of the trial court's decision, we conclude it is necessary to remand this issue for the court's clarification. The court in its conclusions cites caselaw, a Restatement, and American Law Reports (A.L.R.), and it seems to conclude that one, or all of these distinct legal

---

7. Seller cites *Commercial Real Estate Investment, LC v. Comcast of Utah II, Inc.*, 2012 UT 49, ¶ 38, 285 P.3d 1193 (holding that "liquidated damages clauses should be reviewed in the same manner as other contractual provisions"), arguing that the trial court erred in applying a "heightened level of judicial scrutiny to the liquidated damages provision." As an initial matter, Seller's argument misses the mark because the trial court did not reach enforceability of the LD Sentence; rather, it determined that the Termination Sentence was not satisfied. The court did, however, apply a "strict compliance" standard to the Termination Sentence. *See Adair v. Bracken*, 745 P.2d 849, 852 (Utah Ct. App. 1987) ("In order to forfeit a purchaser's interest under a uniform real estate contract, the seller must comply strictly with the notice provisions of the contract." (cleaned up)). However, without directly deciding whether the court's application of "strict compliance" to the Termination Sentence was erroneous, our conclusion—that Seller's Second Notice is deficient without requiring strict compliance—proves fatal to Seller's claim because she cannot show that any perceived error was prejudicial. *See* Utah R. Civ. P. 61. Where notice failed without requiring strict compliance, it would likewise fail under a more restrictive application.

authorities, supports its imposition of an equitable remedy. The legal authorities include distinct legal theories, however, and we have determined that the theories either do not apply in these circumstances, or are unsupported by the court's underlying findings.

A.    Unjust enrichment as a quasi-contract theory does not apply here.

¶39    "The doctrine of unjust enrichment is designed to provide an equitable remedy where one does not exist at law." *Selvig v. Blockbuster Enters., LC*, 2011 UT 39, ¶ 30, 266 P.3d 691 (cleaned up). "Therefore, where an express contract covering the subject matter of the litigation exists, recovery for unjust enrichment is not available." *Id.* (cleaned up).

¶40    In this case, the Contract—which neither party contends is unenforceable—governed the purchase and conveyance of the Property, which is the subject matter of this dispute. Accordingly, both Seller and Buyer are barred from recovering under the quasi-contract theory of unjust enrichment (for acts arising from this transaction). *Id.; see also Mann v. American W. Life Ins. Co.*, 586 P.2d 461, 465 (Utah 1978) ("Recovery in quasi contract is not available where there is an express contract covering the subject matter of the litigation."); *accord United States Fid. & Guarantee Co. v. United States Sports Specialty Ass'n*, 2012 UT 3, ¶ 11, 270 P.3d 464; *Ashby v. Ashby*, 2010 UT 7, ¶ 14, 227 P.3d 246; *AGTC Inc. v. CoBon Energy LLC*, 2019 UT App 124, ¶ 22, 447 P.3d 123. While the trial court acknowledged that this was the law when dismissing Buyer's promissory estoppel claim, it nevertheless ruled that "[s]ince the conditions necessary for the enforcement of the [LD Sentence] are not met here, the court concludes that the [Contract] should be treated as one lacking such a provision" and therefore, Buyer's "unjust enrichment claim is viable." This conclusion was erroneous.

¶41    Even if a contract does not provide an express remedy—
or, as is the case here, the LD Sentence was not triggered[8]—it
does not follow that a party has no legal remedies flowing from
a breach of an express contract. *See Ashby*, 2010 UT 7, ¶ 15. It also
does not follow that equitable remedies should then somehow
come into play. Here, it is undisputed both that the Contract
governs the subject matter of this litigation and that the Contract
is enforceable. Therefore, the trial court erred in permitting
Buyer to advance a claim for unjust enrichment under these
facts, and we cannot affirm the trial court's conclusion on this
basis.

B.     The trial court's other theories of "unjust restitution" are
       not supported.

¶42    It appears obvious that the trial court was trying to legally
justify its ultimate conclusion that principal payments should be
returned to Buyer. And while we are able to affirm on any basis
apparent in the record, *Bailey v. Bayles*, 2002 UT 58, ¶ 13, 52 P.3d
1158, we cannot do so here because the trial court's factual
findings and conclusions on the issue are insufficient and
incomplete, *see Jensen v. Jensen*, 2009 UT App 1, ¶ 8, 203 P.3d 1020
("To withstand appellate review, the trial court's findings of fact
must show that the court's judgment or decree follows logically
from, and is supported by, the evidence. The findings should be
sufficiently detailed and include enough subsidiary facts to
disclose the steps by which the ultimate conclusion on each
factual issue was reached." (cleaned up)). Here, there are

_____

8. We note that the LD Sentence in the Buyer Default Clause—
which the court "read out" of the Contract—was Seller's
remedy, not Buyer's. Buyer's express contractual remedy was
provided for by the Seller Default Clause, which remained in
force even when the trial court read the LD Sentence out of the
Contract.

numerous aspects of the trial court's legal conclusions that do not logically flow from its factual findings.

¶43     For example, although the court concluded that Seller is not entitled to retain the principal payments as liquidated damages on the ground that she did not provide Buyer proper written notice and an opportunity to cure his alleged breaches, such a conclusion does not—by itself—address which party is entitled to the principal payments where Buyer was in breach but Seller did not properly invoke the LD Sentence.

¶44     Citing *Foxley v. Rich*, 99 P. 666 (Utah 1909), and its progeny, Seller argues that a buyer in default cannot normally recover payments where the seller stands ready and able to comply with the terms of the contract. Without deciding the issue, we note that the trial court in this case did not make findings or conclusions sufficient to determine whether *Foxley* and the related cases apply to these facts. Specifically, the court did not make a finding of fact, nor is it apparent from the record, that Seller was willing to sell the Property to Buyer at the time she filed Lawsuit-2 or at any time thereafter. *See id.* at 671.

¶45     Lastly, neither party has addressed the implications of the closing deadline having passed without either party tendering performance, *see New York Ave. LLC v. Harrison*, 2016 UT App 240, ¶ 44, 391 P.3d 268, nor did the trial court consider these implications because it resolved the parties' dispute through Buyer's equitable claim.

¶46     As indicated, the trial court cites the A.L.R. to support its legal conclusion that Buyer could recover its principal payments under an unjust enrichment theory. *See* James O. Pearson, Annotation, *Modern Status of Defaulting Vendee's Right to Recover Contractual Payments Withheld by Vendor as Forfeited*, 4 A.L.R. 4th 993 § 2 (1981). The Utah cases cited by this A.L.R., however, deal exclusively with unconscionability of enforcing forfeiture or

liquidated damages provisions. *E.g., Soffe v. Ridd*, 659 P.2d 1082, 1084 (Utah 1983) ("We affirm the trial court's conclusion that enforcing the liquidated damages provision in this case would result in an arbitrary penalty against the buyers which would be grossly excessive and disproportionate to the loss sustained by seller."), *abrogated by Commercial Real Estate Inv., LC v. Comcast of Utah II, Inc.*, 2012 UT 49, 285 P.3d 1193; *Johnson v. Carman*, 572 P.2d 371, 373 (Utah 1977) ("Although we do not purport to lay down any specific percentage which will be considered unconscionable, to allow the seller to retain the $34,596.10 paid by buyer when seller's actual damages amount to only $25,650.00 would be grossly excessive and disproportionate to any possible loss." (cleaned up)), *abrogated by Commercial Real Estate Inv., LC*, 2012 UT 49; *Fullmer v. Blood*, 546 P.2d 606, 609 (Utah 1976) ("Determination of the question of unconscionableness of a forfeiture of amounts paid is one which also depends on the circumstances."); *Weyher v. Peterson*, 399 P.2d 438, 439 (Utah 1965) ("The pertinent issue is whether the forfeiture of all past payments on the premises as provided in the contract unconscionably burdened [the] defendant."). But it is not apparent from this record that the parties argued unconscionability below—nor have they argued on appeal that enforcement (or non-enforcement) of the Contract would be unconscionable. Importantly, the trial court made no findings sufficient to support a theory of unconscionability. Thus, even though we conclude that Buyer's unjust enrichment quasi-contract claim cannot stand as a basis on which to ground a remedy of restitution, we cannot determine whether enforcement (or non-enforcement) of this Contract may have been unconscionable—which potentially could justify an equitable remedy—without adequate findings or clear analysis indicating that the trial court is anchoring its ultimate conclusion in this legal theory.

¶47   On remand, the trial court should reevaluate the parties' actions or lack of actions—including the passing of the Effective

Closing Date without either party tendering performance. The court should also reassess legal remedies that may flow from those actions in light of the Contract.

## CONCLUSION

¶48 As to Buyer's appeal, we conclude that the trial court did not err in denying specific performance. But because the court did not apply the proper legal standard, it did erroneously quiet title in favor of Seller. Next, as to Seller's appeal, the court did not err in ruling that Seller's Second Notice was deficient and in denying therefore her claim for liquidated damages. The court did err, however, in awarding Buyer damages under a theory of unjust enrichment. Accordingly, as this appeal now leaves a number of aspects unresolved, including the *legal* remedies, if any, available to the parties flowing from failure(s) to perform under the Contract, we remand this matter for additional proceedings not inconsistent with this opinion.[9]

---

9. We do not mean to imply that any trial or evidentiary hearing will need to take place on remand, but instead we anticipate that additional arguments may need to be entertained and supplemental findings and conclusions entered by the trial court.