**2021 UT App 45**

# THE UTAH COURT OF APPEALS

WASATCH VALLEY PIZZA LLC,
Appellant,
*v.*
WILSON PROPERTIES & ASSOCIATES LC, SMOOT COMMERCIAL
PROPERTY MANAGEMENT LC, AND SHARMAN W. SMOOT,
Appellees.

Opinion
No. 20190940-CA
Filed April 15, 2021

Second District Court, Farmington Department
The Honorable Michael Edwards
No. 170701211

David W. Tufts, David L. Arrington, J. Tayler Fox,
and Madeline Aller, Attorneys for Appellant

Jonathan O. Hafen, James L. Ahlstrom, and Erin H.
St. John, Attorneys for Appellees

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGE DAVID N. MORTENSEN and SENIOR JUDGE KATE
APPLEBY concurred.[1]

CHRISTIANSEN FORSTER, Judge:

¶1     Wasatch Valley Pizza LLC (Wasatch) appeals the district court's grant of summary judgment in favor of Wilson Properties & Associates LC, Smoot Commercial Property Management LC, and Sharman W. Smoot (collectively, Wilson). We affirm.

---

1. Senior Judge Kate Appleby sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

BACKGROUND

¶2      In 2016, Wasatch began looking into the possibility of leasing certain property (the Property) Wilson owned in Centerville, Utah, to develop a Pizza Hut restaurant. The Property's previous tenant had operated a custard shop at the location, selling frozen custard and sandwiches.

¶3      The Property was in a zone known as "commercial high." The custard shop was classified as "retail, specialty," which is a permitted use within the commercial high zone. Other potential classifications within the commercial high zone include "restaurant, general," which is also permitted, and "restaurant, fast food," which is conditionally permitted. For a conditionally permitted use, the occupant must obtain a conditional use permit (CUP) by complying with certain mitigation measures as required by Centerville City (the City).

¶4      Wasatch and Wilson began negotiating a lease, and Wasatch conducted due diligence on the Property. As part of its due diligence, Wasatch spoke with a Centerville city planner, who informed it that the City would not require Wasatch to obtain a CUP or a new certificate of occupancy for the Property as long as it did not increase the size of the building by more than 30% or its value by more than 50%.

¶5      Wilson and Wasatch entered into a lease agreement (the Lease) on June 29, 2016. The Lease included a Permitted Use Clause, which gave Wasatch "the right to use and occupy the [Property] as a Pizza Hut restaurant, similar to other Wasatch Valley Pizza Hut restaurants for the sale of prepared pizza, Italian sandwiches, pasta, and other Italian food products, and take-out chicken wings and chicken wing products for on and off-premises consumption"; "to sell desserts and drinks (including wine and beer), for on- and off-premises consumption, catering and delivery services"; and to use the Property "for incidental purposes."

¶6 The Lease also contained a "Landlord Representations and Warranties" section in which Wilson warranted "that the [Property is] zoned for restaurant use and there is no legal impediment to the construction and use of the [Property] as a restaurant or for restaurant uses" (the Warranty). The Lease does not define the terms "restaurant use" or "legal impediment."

¶7 With respect to necessary permits, the Lease included a Contingencies Clause, which stated,

> Tenant may, at Tenant's expense, apply for, and use reasonable efforts to obtain, all Permits, if any are necessary. If the Permits are not obtained, within forty (40) days after mutual execution and delivery of this Lease to both parties . . . or if they are available only with conditions unacceptable to Tenant, or if Tenant determines that it would not be feasible or economically satisfactory for Tenant to build or operate its proposed facility, Tenant shall have the right to terminate this Lease, provided it has given Landlord written notice no later than ten (10) days after expiration of the Permit Period. As part of the process of seeking Permits Tenant may also agree to conditions to issuance of use permits or other Permits for Tenant's use.

The Lease defined "permit" as

> all authorizations and approvals issued by government agencies and necessary for Tenant to install Tenant Improvements and operate its business on the [Property] such as (but not limited to) ~~zoning change~~,[2] variance, use permit,

---

2. The strikethrough formatting appears in the lease.

environmental law compliance, site plan approval, parking approval, sign approval, curb cut and other access approval, utility connection permit, and building permit.

Wilson agreed to "cooperate with Tenant to enable Tenant to . . . maintain, renew or obtain permits, licenses or other approvals."

¶8 Several months after entering the Lease, Wasatch submitted its building plans to the City. At that time, the City's zoning administrator informed Wasatch that despite the city planner's suggestions to the contrary, the zoning classification for its business was different from the custard shop and that Wasatch would therefore need to obtain a CUP. Wasatch attempted to convince the City, with Wilson's cooperation, that it should be classified as "retail, specialty" just as the custard shop was, reasoning that the custard shop sold items, such as sandwiches, that were similar to what Pizza Hut would sell. However, the City rejected Wasatch's arguments and classified the Pizza Hut as "restaurant, fast-food."

¶9 Wasatch began taking steps to obtain the required CUP, as well as necessary approvals from the Utah Department of Transportation (UDOT). The City approved the CUP, conditioned upon Wasatch meeting certain conditions, including several imposed by UDOT. But Wasatch calculated the costs of complying with these conditions to be somewhere between $100,000 and $200,000. Wasatch demanded that Wilson pay these costs based on the Warranty. Wilson refused and served Wasatch with a notice to pay rent or vacate the Property, so Wasatch withdrew its application for the CUP and informed Wilson that it was terminating the Lease.[3]

---

3. These events occurred more than fifty days after the Lease was signed, so Wasatch's option to terminate the Lease under the Contingencies Clause had passed.

¶10    Wasatch filed a complaint against Wilson, asserting claims for breach of the Lease. It alleged that Wilson had breached the Warranty and sought $147,431.88 in damages. Wilson filed an answer and counterclaim, asserting that Wasatch breached the Lease by failing to pay rent and other expenses.

¶11    The parties filed cross-motions for summary judgment. The district court granted Wilson's motion and denied Wasatch's, concluding that Wilson did not breach its obligations under the Warranty but that Wasatch did breach its obligations by failing to pay rent. The court entered final judgment against Wasatch in the amount of $255,316.33 plus $118,877.86 in attorney fees under the Lease. Wasatch now appeals.


ISSUE AND STANDARD OF REVIEW

¶12    Wasatch asserts that the district court erred in denying its motion for summary judgment and granting Wilson's. "Because a district court's ruling on summary judgment is a question of law, we review it for correctness." *Rupp v. Moffo*, 2015 UT 71, ¶ 5, 358 P.3d 1060.


ANALYSIS

I. The Warranty

¶13    This case turns on the interpretation of two phrases in the Warranty, neither of which is defined in the Lease: "restaurant use" and "legal impediment." "We determine what the parties have agreed upon by looking first to the plain language within the four corners of the document." *Thatcher v. Lang*, 2020 UT App 38, ¶ 31, 462 P.3d 397 (quotation simplified). In doing so, "we look for a reading that harmonizes the provisions and avoids rendering any provision meaningless" by "examin[ing] the entire contract and all of its parts in relation to each other and giv[ing] a reasonable construction of the contract as a whole." *Id.* (quotation simplified).

¶14    Wasatch maintains that "restaurant use," read in conjunction with the Permitted Use Clause, "could only mean a Pizza Hut fast food restaurant." While we do not necessarily agree with this interpretation, we accept it for purposes of our analysis because we ultimately agree with Wilson that the challenges Wasatch faced in obtaining the CUP do not constitute legal impediments under the Lease.

¶15    Wasatch relies on the *Black's Law Dictionary* definition of "impediment" as a "hindrance or obstruction." *See Impediment*, Black's Law Dictionary (11th ed. 2019). Wasatch asserts that a hindrance broadly includes anything that "interferes with or slows the progress of someone or something." *Hindrance*, Merriam-Webster, https://www.merriam-webster.com/dictionary/hindrance [https://perma.cc/D4BV-BFQJ]. And thus, Wasatch concludes that "any city ordinance or regulation can be a legal 'impediment' regardless of whether means exist to overcome it" if it "interfered with, held back, [or] slowed down . . . the construction and operation of [Wasatch's] restaurant."

¶16    Wilson, on the other hand, asserts that "legal impediment," as used in the Warranty, should be interpreted as something that bars or blocks the construction of the restaurant altogether. It points out that "bar" and "block" are synonyms of "hindrance," *id.*, and that the word "hinder" is also defined as "to hold back: prevent, check," *Hinder*, Merriam-Webster, https://www.merriam-webster.com/dictionary/hinder [https://perma.cc/ER6V-J796]. Wilson asserts that Wasatch's interpretation would lead to an absurd result by making Wilson liable for "literally any and every required interaction with [the] City." Wilson "in essence would be warranting that [the] City would do nothing and ask nothing of Wasatch . . . , who instead alone would get to dictate the size, structure, and manner of operations of its Pizza Hut."

¶17    Recognizing the potential implications of its original argument, Wasatch qualified its position at oral argument, conceding that not every ordinance that slows down the

progress of construction constitutes a "legal impediment" and suggesting instead that something that cannot be overcome through "reasonable efforts" should be construed as a "legal impediment." Wasatch asserts that the efforts necessary to comply with the CUP and UDOT conditions—i.e., paying the associated $100,000 to $200,000 costs—would be unreasonable.

¶18    We agree with Wilson, however, that even this narrower interpretation is inconsistent with the terms of the Lease. The Contingencies Clause anticipated that there might be permitting requirements that could not be overcome by "reasonable efforts," including conditions that might be "unacceptable to [Wasatch]" or that might make it "not . . . feasible or economically satisfactory for [Wasatch] to build or operate its proposed facility." Further, the Contingencies Clause provided Wasatch with a remedy for such a circumstance—it could terminate the Lease so long as it did so within fifty days of the Lease's execution. It would be unreasonable to read the Warranty as guaranteeing Wasatch's ability to overcome permitting requirements with reasonable efforts while at the same time planning for such a contingency and providing a specific remedy.

¶19    Moreover, the Lease specifically includes "use permit," "site plan approval," and "curb cut and other access approval" within its definition of "permit," while explicitly excluding "zoning change" with a strikeout. This suggests that although the parties believed the restaurant use would not require a zoning change, they anticipated the possibility that a CUP and various road- and traffic-related approvals would need to be obtained. It is not logical that while anticipating the potential need for such permits and addressing them in the Lease, Wilson nevertheless would warrant that no CUP or UDOT approvals would be necessary.[4] As the district court observed, "the CUP

---

4. Deposition testimony from the City's zoning administrator suggested that conditions such as a traffic study and UDOT

(continued…)

imposed by [the City] amounted to a financial impediment, not a legal impediment." "After [the City] imposed the CUP requirement, [Wasatch] was still able to continue with construction" but "chose to end construction after determining the expense of obtaining the CUP was too high."

¶20 Because the requirements to obtain a CUP and UDOT approvals were anticipated in the Lease, Wasatch's broad interpretation of the term "legal impediment," as used in the Warranty, is not a reasonable construction of that provision. Thus, Wilson did not breach the Warranty by refusing to pay the cost of satisfying the CUP and UDOT requirements.

## II. Fees on Appeal

¶21 The district court awarded Wilson its fees in accordance with the attorney fees provision in the Lease. As the prevailing party on appeal, Wilson is also entitled to an award of fees and costs incurred in defending this appeal. *See Telegraph Tower LLC v. Century Mortgage LLC*, 2016 UT App 102, ¶ 52, 376 P.3d 333 ("When a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." (quotation simplified)).

## CONCLUSION

¶22 We agree with the district court that the requirements imposed on Wasatch by the City and UDOT did not constitute

---

(…continued)

requirements could have been imposed as part of the site plan approval regardless of whether the use was permitted or conditional. Thus, it is by no means clear that Wasatch could have avoided these expenses even if the City had permitted the Pizza Hut to operate under the "retail, specialty" designation as it originally anticipated.

legal impediments under the Lease. Thus, Wilson did not breach the Warranty, and the district court did not err in granting Wilson's summary judgment motion and denying Wasatch's. Accordingly, we affirm the district court's ruling but remand for the court to calculate Wilson's costs and attorney fees incurred on appeal.

———————