**2025 UT App 115**

## THE UTAH COURT OF APPEALS

KYLE R. HALL, BRIAN A. HINTZE, AND KELLI HINTZE,
Appellants,
*v.*
SPRINGVILLE CITY, CENTRAL UTAH WATER CONSERVANCY DISTRICT,
SPRINGVILLE IRRIGATION COMPANY, AND UTAH STATE ENGINEER,
Appellees.

Opinion
Nos. 20220794-CA; 20220795-CA
Filed July 25, 2025

Third District Court, Salt Lake Department
The Honorable Laura Scott
No. 365729804

Jamie Carpenter, Attorney for Appellants

J. Craig Smith, Kathryn J. Steffey, Jeffry R. Gittins,
Jennie B. Garner, and John A. Penrod,
Attorneys for Appellee Springville City

Steven E. Clyde, Emily E. Lewis, and Nathaniel E.
Broadhurst, Attorneys for Appellee Central Utah
Water Conservancy District

Riley S. Snow, Attorney for Appellee
Springville Irrigation Company

Sarah M. Shechter and Gordon H. Rowe,
Attorneys for Appellee Utah State Engineer

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and JOHN D. LUTHY concurred.

HARRIS, Judge:

¶1      Appellants Kyle R. Hall, Brian A. Hintze, and Kelli Hintze
(collectively, Claimants) claim to own water rights associated
with two parcels of land in Hobble Creek Canyon. After the Utah

State Engineer (State Engineer) issued a proposed determination substantiating Claimants' water rights, Springville City (the City) objected, claiming that it owned the water rights in question. Eventually, the district court entered summary judgment in the City's favor, concluding—pursuant to facts it considered undisputed—that Claimants' predecessors had conveyed to the City "all water rights" associated with the relevant parcels. In separate appeals that we consider together in this opinion, Claimants challenge the court's summary judgment order and assert that genuine issues of material fact remain for decision by a factfinder. We disagree with Claimants' assertions, and we therefore affirm the court's order.

## BACKGROUND[1]

### *The Parcels*

¶2      This case concerns water rights connected to two parcels of real property: the Anderson Ranch and the Clark Ranch, both located in Hobble Creek Canyon in Utah County, Utah. Oscar Anderson first settled the Anderson Ranch—also known as "Special Section 57"—in 1890, before Utah became a state. At an even earlier date (perhaps as early as 1879), Erastus Clark settled the Clark Ranch—also known as "Special Section 54." Both Anderson and Clark made various improvements to the parcels, including erecting structures (e.g., houses), as well as diverting water and cultivating crops. Eventually, Anderson and Clark each obtained a "land patent" for his parcel from the federal government, giving them fee-simple ownership of the parcels.

---

1. When reviewing a district court's order granting summary judgment, we "recite the facts in the light most favorable to the non-moving party." *Burton v. Chen*, 2023 UT 14, ¶ 5 n.2, 532 P.3d 1005 (cleaned up).

Most important for present purposes, all parties to these appeals agree that, prior to 1903, both Anderson and Clark appropriated water for use on the parcels.

¶3 Clark later conveyed the Clark Ranch to his wife, and in 1926, she conveyed the land to their son, John Hazel Clark. Anderson died intestate in 1926, but by 1937 his wife Mary Ellen Anderson had been deemed the administrator of his estate and had also received title to the Anderson Ranch.

¶4 Before 1928, the City had managed the distribution of irrigation water to some parcels of land, including the Anderson Ranch and the Clark Ranch. However, by 1928, the City claims to have ceded that management to the Springville Irrigation Company (SIC), a company the City asserts was formed by "the owners and users of [irrigation] waters" on specified parcels who were "desirous of forming a corporation . . . for the purpose of taking over" water rights appurtenant to stockholders' land and "making distribution thereof to the stockholders of said company."[2] That same year—at least according to the City—John Hazel Clark signed an agreement with SIC wherein SIC agreed to convey to him "20 shares of the capital stock" of SIC in

---

2. Claimants assert that factual disputes exist regarding the formation of SIC as well as the transactions between SIC and the owners (or purported owners) of the Anderson Ranch and the Clark Ranch; Claimants also raise authenticity objections to many of the documents that underlie the City's assertions regarding SIC. However, as explained, *infra* ¶¶ 26–33, these potential disputes of fact are not material, because even if we assume that none of the 1920s-era SIC transactions occurred, the City acquired the relevant water rights by virtue of the 1940s-era transactions. Nevertheless, for purposes of completeness, we include here a brief synopsis of the 1920s-era events, accounting in our description for the reality that these facts remain disputed.

consideration for "all [his] right, title and interest in and to the waters from Springville Irr[igation] System . . . which irrigate [20 acres of land on the Clark Ranch] and which are appurtenant thereto, . . . which are known and designated as all creek and spring waters of the Springville Irrigation System." After this agreement was executed, SIC issued a stock certificate to John Hazel Clark purporting to convey to him 20 shares of SIC stock.

¶5　The next year, Mary Ellen Anderson, apparently on behalf of Oscar Anderson's estate, entered into a similar agreement with SIC.[3] Under that contract, SIC agreed to provide "12 shares of the capital stock" of SIC in consideration for "all [the estate's] right, title and interest in and to the waters from Springville Irr[igation] System . . . which irrigate [12 acres of land on the Anderson Ranch] and which are appurtenant thereto, . . . which are known and designated as all creek and spring waters of the Springville Irrigation System." Later, SIC issued a stock certificate to Oscar Anderson's estate purporting to convey 12 shares of SIC stock.

¶6　By the early 1940s, the City determined that it was "necessary and advisable to purchase and acquire an additional water supply to supplement the existing municipally owned water system." To this end, in 1941 the City passed an ordinance authorizing the "purchase . . . [of] water rights, together with the necessary real estate in connection therewith"; the ordinance

---

3. Claimants also assert that factual disputes remain regarding Mary Ellen Anderson's authority to have conveyed any water rights associated with the Anderson Ranch to SIC in 1929; in particular, they assert that she had not yet been appointed administrator of Oscar Anderson's estate. As with the other factual issues Claimants attempt to raise regarding the 1920s-era events, any such factual issues are immaterial due to the 1940s-era transactions. *See infra* ¶¶ 26–33.

expressly authorized the City to acquire land and water rights from Mary Ellen Anderson and John Hazel Clark, among others.

¶7    Following passage of this ordinance, the City negotiated agreements by which it would acquire both the Anderson Ranch and the Clark Ranch, along with appurtenant water rights. In October 1941, Mary Ellen Anderson executed a warranty deed (the 1941 Deed) conveying to the City "Special Section 57"—the Anderson Ranch—"[t]ogether with all water and water rights appurtenant thereto and heretofore and now used on said premises and particularly 12 shares of capital stock in [SIC] and all improvements thereon." The 1941 Deed was recorded in the office of the Utah County Recorder on November 3, 1941.

¶8    Likewise, in March 1942, John Hazel Clark and his wife, Clara, executed a warranty deed (the 1942 Deed) conveying to the City "Special Section 54"—the Clark Ranch—"[t]ogether with all water and water rights appurtenant thereto," as well as "20 shares of the capital stock of [SIC] and all improvements thereon." The 1942 Deed was recorded in the office of the Utah County Recorder on May 2, 1942.

¶9    A few years after acquiring the Anderson Ranch and the Clark Ranch along with all appurtenant water rights, the City published a "Notice for Bids" offering these parcels of land for sale to the public, but with one important caveat: that "[a]ll water rights appurtenant to or in any way appertaining to said lands will be reserved by [the City]." Later, the City received a bid from Ralph Phillips, who offered to purchase both the Anderson Ranch and the Clark Ranch in exchange for "$2000.00 cash, five shares of water stock in [SIC], also [culinary] power, and any or every other water rights here-to-fore or now claimed by [Phillips's family] in Bartholomew Canyon," a side canyon in Hobble Creek Canyon. The City accepted Phillips's bid, approved the sale, and subsequently executed a deed (the Phillips Deed) conveying

"Special Section 54" and "Special Section 57" to Phillips. Consistent with the City's notice for bids, the conveyance included a reservation, as follows:

> All water and water rights heretofore used on the aforesaid granted premises have been separately sold and transferred and this conveyance is made subject to the reservation of all water rights excepting only a flood water right to which the cultivated or improved part of the aforesaid granted premises shall be entitled when and as long as such flood water is available.

¶10 That same day, however, the City adopted a resolution allowing Phillips to continue to use the City's reserved water until such time as the City needed it. The resolution acknowledged Phillips's desire to "us[e] the water that is now and has heretofore been used on" the Anderson Ranch and the Clark Ranch, and it noted the City's willingness to allow Phillips to use "the water formerly used on said property . . . until such time as [the City] may use it for other purposes or for municipal purposes." The resolution authorized municipal officials "to execute, acknowledge and attest an agreement by and between" the City and Phillips "setting forth the necessary provisions and conditions under which [Phillips] may be entitled to use water belonging to" the City on the property he had purchased.

¶11 Later, the City and Phillips executed three agreements related to the transaction. The first two were executed on the same day the City executed the Phillips Deed. In one agreement, the City formalized its permission for Phillips and his wife, Ethel— subject to the City's use and discretion—to use the City's reserved water. That agreement provided, in relevant part, as follows:

WHEREAS, [the City] has purchased certain real estate and water rights in Hobble Creek Canyon in connection with the Bartholomew Canyon Water and Power Project, and

WHEREAS, at the present [the City] is not using the water purchased for culinary or municipal purposes, and

WHEREAS, [the City] has sold to [Phillips] the following described property situate[d] in Utah County, State of Utah, to-wit: [the Anderson Ranch and the Clark Ranch]

AND, WHEREAS, [Phillips] is desirous of using the water for irrigation purposes which was formerly used on the hereinabove described property.

NOW, THEREFORE, IT IS HEREBY AGREED that [Phillips] may have the first right or privilege to lease from year to year the water rights which were formerly used for irrigation on [the Anderson Ranch and the Clark Ranch] for such time as [the City] does not make use of said water for culinary, power, or other municipal purposes, it being definitely understood that said water was [procured] for municipal purposes for the use and benefit of the inhabitants of Springville, Utah, and said water is to be retained and put to such uses just as soon as conditions and circumstances will permit. . . .

It is understood and agreed that nothing in this agreement shall be construed to bind [the City] for any definite period of time, but it is understood that as long as [the City] considers it advisable to use the water rights herein mentioned for irrigation

purposes and does not use said water for its own
purposes that [Phillips] may have the first privilege
to lease and use said water.

¶12    The other agreement executed that day noted that the
City, in conveying the Anderson Ranch and the Clark Ranch to
Phillips, had "reserved all water rights now and heretofore used
upon [the Anderson Ranch and the Clark Ranch] except flood
water."

¶13    Finally, the third agreement was executed a few
months later, and it memorialized the transfer of "certain
water rights" that Phillips[4] had promised to provide to the City
"as part of the consideration" for his purchase of the Anderson
Ranch and the Clark Ranch. Per that agreement, Phillips
conveyed to the City all of his "right, title, and interest of every
kind and nature in and to the use of such water rights . . . in the
Bartholomew       Canyon       Springs,"      and      that      "said
conveyance, transfer, grant, or relinquishment to [the City]
includes the rights to the use of water out of Bartholomew Canyon
for any and all purposes whatsoever including irrigation,
culinary, power and any other purpose for which said water may
have heretofore been used."

---

4. This agreement was between Phillips and his wife, Ethel, on the
one hand, and the City, on the other hand. As noted, some of the
agreements related to the Phillips transactions included Ethel,
and others did not. Our use of the term "Phillips" in this opinion
is therefore intended as a generic term that sometimes includes
Ethel Phillips, depending on context.

*The General Stream Adjudication and Proposed Determination*

¶14 At some point during this time period,[5] a general stream adjudication was commenced for the area that includes Hobble Creek. The purpose of the general stream adjudication process was to determine the water rights in the area and create a centralized record of those rights. *See Provo River Water Users' Ass'n v. Morgan*, 857 P.2d 927, 935 (Utah 1993) ("The basic goal of general adjudication is to record all water claims from a particular source which subsequent appropriators can rely upon before making their investments." (cleaned up)).

¶15 Decades later, in 1974, the subsequent owners of the Anderson Ranch and the Clark Ranch—Carlos L. Watters and Howard L. Jensen (Watters and Jensen))—filed diligence claims[6]

---

5. The parties maintain that the general stream adjudication was commenced in 1936, and the case number assigned to the case by the district court (which begins with "36") seems to corroborate this. However, the State Engineer's website indicates that it was commenced in 1944. *See Utah Lake/Jordan River Adjudication—Book 4 Details*, Div. Water Rts., https://waterrights.utah.gov/adjstatus/ (click "Subdivision Number 51-4") [https://perma.cc/U5JC-HBQ9]. For our purposes, however, the exact date is not material.

6. "A diligence claim is a claim to a water right established by putting water to beneficial use prior to March 12, 1903, when the statutes creating the mandatory appropriation application process went into effect." *Provo River Water Users' Ass'n v. Morgan*, 857 P.2d 927, 929 n.4 (Utah 1993). Before 1903, a "diligence right" could be established "by diverting [water] from its natural channel and putting it to beneficial use." *Eskelsen v. Town of Perry*, 819 P.2d 770, 771 n.1 (Utah 1991). In 1903, the Utah legislature enacted a statute that provided that the filing of an application

(continued…)

with the Utah Division of Water Rights, asserting that they owned certain water rights associated with the Anderson Ranch and the Clark Ranch. In the claim associated with the Clark Ranch (the Clark Water Right), Watters and Jensen asserted a "[c]laim to surface water by right of use prior to March 12, 1903," for 3.0 cubic feet per second (cfs) of water from "Center Spring" for the irrigation of 20 acres (later amended to 7.07 acres), stockwatering of 90 head of cattle, and domestic use for two families, with a claimed priority date of 1880. This diligence claim served as the basis for the right that was later labeled "WR 51-3872."

¶16    In the claim associated with the Anderson Ranch (the Anderson Water Right), Watters and Jensen asserted a right to 1.0 cfs of water from "Upper Spring" for the irrigation of 5 acres and the stockwatering of 90 head of sheep, with a claimed priority date of 1880.[7] This diligence claim served as the basis for the right

---

with the State Engineer's office is the exclusive method for a prospective water user to establish a claim to water rights. *See id.*

7. The City points to a statement made by High Tower Properties LP (High Tower)—the successor-in-interest to Watters and Jensen and the predecessor-in-interest of Appellants Brian A. Hintze, and Kelli Hintze—that the source of the water for the Anderson Water Right was not even discovered until 1974. In response to a request for admission that "prior to 1928, Water Right Number 51-3874 was historically distributed by [the City or SIC]," High Tower offered a denial, and stated that "the spring was first discovered on or around May 8, 1974, and no party distributed water from the spring for Water Right Number 51-3874 before its creation on that date." The City asserts that this statement raises doubt as to whether the Anderson Water Right could be a valid diligence claim. We express no opinion about the correctness of the City's assertion.

that was later labeled "WR 51-3874." In this opinion, we sometimes use the term "Water Rights" to refer, collectively, to the Clark Water Right and the Anderson Water Right.

¶17　Some years later, in 1986, the State Engineer evaluated the two water rights claims submitted by Watters and Jensen, and it issued a Proposed Determination (PD) substantiating those claims. In response, both SIC and the City filed timely objections. SIC claimed, among other things, that Watters and Jensen couldn't own the Water Rights because any right to use the water in question had previously been conveyed to SIC in exchange "for shares of stock in [SIC]" and that "[a]ny rights to the source waters identified are now represented by shares of stock in [SIC]." And the City claimed, among other things, that Watters and Jensen couldn't own the Water Rights because any right to use the water in question "was owned by [the City] or [SIC]" and because the City was "the owner of the entire flow of water from the sources given" for the Water Rights.

*District Court Proceedings*

¶18　In 2020, the City filed motions for summary judgment in the general stream adjudication litigation, asking the court to declare the Water Rights invalid because Claimants' predecessors had conveyed away all water represented by the Water Rights, either in the 1920s-era agreements with SIC or in the 1940s-era conveyances to the City. SIC and the Central Utah Water Conservancy District joined in the City's motions; notably, the State Engineer did too, effectively reversing that office's earlier position and asserting that the PD had been improvidently issued.

¶19　Claimants opposed the City's motions, asserting generally that disputed factual issues should preclude summary judgment. Claimants raised authenticity questions regarding the 1920s-era SIC documents and asserted that those documents were in any

event ambiguous. Claimants also pointed out that their chain of title included a "flood water right" associated with the Anderson Ranch and the Clark Ranch, and they argued that the conveyance of this right from the City to Phillips included the water at issue with the Water Rights. Finally, they argued that this conveyance did not violate Article XI, Section 6 of the Utah Constitution because Phillips had "exchange[d]" water rights with the City.

¶20    The motions first came on for hearing in front of the special master who had been appointed to assist with the general stream adjudication. After oral argument, the special master recommended that the City's motions be granted. The special master concluded that Claimants had "failed to produce any evidence of a legally permissible use of water on the property over and above what was traded to SIC for shares in 1928 or sold to the City" in the early 1940s, and that therefore the "uncontroverted evidence show[ed] that the City [was] entitled to judgment . . . as a matter of law."

¶21    Claimants objected to the special master's recommendations, but the district court—after briefing and oral argument—overruled Claimants' objection and issued an order granting the City's motions for summary judgment. The court first rejected Claimants' evidentiary objections, concluding that— "regardless of any ambiguity" in the 1920s-era SIC documents— Claimants' predecessors had conveyed all relevant water rights to the City in the 1940s. The court explained that the City had reserved all water rights for itself when it conveyed both parcels to Phillips, and it concluded that the City was "constitutionally prohibited" from conveying a quantifiable water right to Phillips in connection with the "flood water right" language. Finally, the court rejected the argument that there had been an "exchange" of water rights between the City and Phillips, explaining that there was "no admissible evidence to support" this theory.

¶22    Following the court's order granting the City's motions for summary judgment, Claimants filed motions to certify the order as final for purposes of appeal. Claimants' motions to certify were unopposed, and the district court subsequently granted them. The court noted that, under Utah law, Claimants had the right to immediately appeal any "district court order, judgment, or decree that resolves an objection" to a proposed determination rendered by the State Engineer. *See* Utah Code § 73-4-11, -16(2)(a). But the court explained that the City's objection to the PD had "not been fully resolved" because that objection had not been limited to the Water Rights at issue in this appeal but, instead, had covered other water rights claims as well, and the City's objection to those other claims remained pending. Nevertheless, the court ruled that its summary judgment order could be certified for immediate appeal pursuant to rule 54(b) of the Utah Rules of Civil Procedure, because the City's objection "contain[ed] multiple claims for relief and multiple parties," the summary judgment order was otherwise final, and there was "no just reason to require the parties . . . to delay in bringing their appeal." Thus, the court certified its summary judgment order as a "final appealable order pursuant to" rule 54(b).[8]

ISSUE AND STANDARD OF REVIEW

¶23    Claimants now appeal, and they challenge the order granting summary judgment in the City's favor regarding ownership of the Water Rights. "We review a district court's grant of summary judgment for correctness." *Fine v. University of Utah School of Med.*, 2024 UT 4, ¶ 12, 545 P.3d 215 (cleaned up). "Summary judgment is appropriate only when, viewing all facts and reasonable inferences therefrom in the light most favorable to

---

8. No party challenges the district court's rule 54(b) certification order or otherwise contests our appellate jurisdiction in this case.

the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Id.* (cleaned up); *see also* Utah R. Civ. P. 56(a).

## ANALYSIS

¶24    The district court determined that, as a matter of law and undisputed fact, Claimants' claim to the Water Rights was invalid because the City owns the rights to the water at issue. Claimants take issue with that determination, and they assert that genuine issues of material fact exist regarding several matters and that therefore summary judgment is inappropriate.

¶25    Specifically, Claimants first argue that there is a dispute of fact as to whether the City ever "acquired diligence waters"—the Water Rights—from John Hazel Clark and Mary Ellen Anderson, Claimants' predecessors-in-interest. Claimants further argue that a dispute of fact remains as to whether the City reserved the Water Rights when it deeded the Anderson Ranch and the Clark Ranch to Phillips; in particular, Claimants assert that the "flood water right" in the Phillips Deed might have included the Water Rights. Relatedly, Claimants assert that the conveyance of this "flood water right" did not violate the Utah Constitution because Phillips "exchanged" water rights with the City. Finally, Claimants assert that because the City's original objections to the PD did not specifically reference the 1940s-era land conveyances, Claimants were denied due process for lack of notice. We address these arguments in turn, and we explain that, for the reasons discussed, we find each of them unpersuasive.

### I. In the 1940s, the City Owned the Land and All Appurtenant Water Rights

¶26    We first address Claimants' contention that the City never obtained the Water Rights. Specifically, Claimants argue that the 1941 Deed and the 1942 Deed—the conveyances from John Hazel Clark and Mary Ellen Anderson to the City—"did *not* include *all* water and water rights appurtenant thereto." For the reasons discussed, we reject this assertion and hold that, as a matter of law and undisputed fact, the 1941 Deed and the 1942 Deed conveyed to the City all water rights appurtenant to the Anderson Ranch and the Clark Ranch, including the diligence rights that Claimants assert form the basis for their claimed Water Rights.

¶27    "At their most basic level, deeds are simply a particular type of contract between parties." *Ocean 18 LLC v. Overage Refund Specialists LLC* (*In re Excess Proceeds from Foreclosure of 1107 Snowberry St.*), 2020 UT App 54, ¶ 20, 474 P.3d 481. "Deeds are to be construed like other written instruments, according to ordinary rules of contract construction." *Id.* (cleaned up).

¶28    Under those rules, the "overriding principle is that the intentions of the parties are controlling." *Id.* ¶ 21 (cleaned up). When assessing the intent of the parties, the appropriate place to begin is with the language the parties agreed to use. *See Central Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599 ("We first look to the four corners of the agreement to determine the intentions of the parties." (cleaned up)); *see also Hartman v. Potter*, 596 P.2d 653, 656 (Utah 1979) (stating that "the cardinal rule of deed construction" is that "the intention of the parties as drawn from the whole deed must govern" (footnote omitted)). "Where the language used in the contract is facially unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a

matter of law, without resort to parol evidence." *Ocean 18*, 2020 UT App 54, ¶ 22 (cleaned up).

¶29   In this case, the 1941 Deed and the 1942 Deed clearly conveyed to the City all water rights—without exception—that were appurtenant to the Anderson Ranch and the Clark Ranch. Mary Ellen Anderson executed the 1941 Deed conveying the Anderson Ranch "[t]ogether *with all water and water rights appurtenant thereto* and heretofore and now used on said premises." (Emphasis added.) Likewise, John Hazel Clark and his wife executed the 1942 Deed conveying the Clark Ranch "[t]ogether with *all water and water rights appurtenant thereto*." (Emphasis added.)

¶30   The phrase "all water and water rights" in these conveyances broadly encompassed any water rights appurtenant to the Anderson Ranch and the Clark Ranch and is unambiguous as a matter of law. *See Ruth B. Hardy Revocable Trust v. Eagle Mountain City*, 2012 UT App 352, ¶ 10, 295 P.3d 188 (holding that the phrase "all water rights . . . thereunto belonging" is unambiguous as a matter of law); *see also Spears v. Warr*, 2002 UT 24, ¶ 40, 44 P.3d 742 (holding that the deed in that case unambiguously conveyed "all water or water rights . . . appurtenant to or associated with" the land), *overruled in part on other grounds by Tangren Family Trust v. Tangren*, 2008 UT 20, 182 P.3d 326, *and abrogated in part on other grounds by RHN Corp. v. Veibell*, 2004 UT 60, 96 P.3d 935. Neither the 1941 Deed nor the 1942 Deed expressly reserved any water right, and such a reservation was necessary—under clear case law applicable at the time—if the grantor wanted to keep a water right appurtenant to land being conveyed. *See Thompson v. McKinney*, 63 P.2d 1056, 1058 (Utah 1937) ("[A] deed in statutory form, without reservation of water, conveys whatever rights the grantor has to the water appurtenant to the land."); *Cortella v. Salt Lake City*, 72 P.2d 630,

635 (Utah 1937) ("[A] conveyance of land passes an appurtenant water right unless the same is expressly reserved.").

¶31 Claimants resist this conclusion by arguing that the Water Rights were not traded for SIC shares in the 1920s and, as a result, the conveyances to the City in the 1940s did not include the Water Rights. But this argument fails because—regardless of whether the 1920s SIC transactions included the Water Rights—the 1940s deeds conveyed to the City all water appurtenant to the Anderson Ranch and the Clark Ranch. Both the 1941 Deed and the 1942 Deed conveyed not only "all water and water rights appurtenant" to the land, but they also conveyed the SIC stock then possessed by the Andersons and the Clarks. Thus, the deeds took a belt-and-suspenders approach and conveyed to the City all water rights appurtenant to the land, regardless of whether those rights ran through SIC.[9]

---

9. For this reason, we need not reach the merits of any questions about what was actually conveyed in the 1920s-era agreements, and we need not spend time analyzing the documents involving SIC's formation. For purposes of our analysis, we assume without deciding (and in keeping with our obligation, given the procedural posture of this case, to construe facts in the light most favorable to Claimants) that Mary Ellen Anderson and John Hazel Clark did *not* convey their diligence water claims to SIC in exchange for SIC stock shares.

We note here too that Claimants limited their authenticity and hearsay challenges to the SIC documents. And at oral argument, counsel for Claimants clarified that they had no authenticity objection to the 1940s-era documents. Accordingly, because the 1940s-era documents are dispositive, we need not reach the merits of any authenticity questions involving the 1920s-era documents.

¶32 Moreover, Claimants' claim to the Water Rights necessarily *must* rely on the City's ownership of all water rights appurtenant to the Anderson Ranch and the Clark Ranch before the City's conveyance of the land to Phillips in 1944. If the Water Rights were never conveyed to the City, Claimants would have no claim to them whatsoever because their claim rests on the chain of title that runs from Mary Ellen Anderson and John Hazel Clark through the City to Phillips and his successors-in-interest. Claimants do not assert that they somehow acquired the Water Rights through another party outside of this chain of title. Indeed, Claimants seem to acknowledge this reality in their briefing, noting that "[i]n 1941, when Mary E. Anderson sold [the Anderson Ranch] to the City with the 12 SIC shares and other water rights on the land, the City arguably became the water rights owner of all the water on such land," and stating that "it was undisputed [the] Clarks conveyed 'all water and water rights' to the City in the 1942 Deed" and that the City "thus owned all of the water, including the twenty (20) shares of SIC stock and all other diligence, decreed, or appurtenant water rights not converted to shares."

¶33 Accordingly, the district court did not err by concluding, as a matter of law and undisputed fact, that the 1941 Deed and the 1942 Deed conveyed the Water Rights to the City.

## II. The City Reserved the Water Rights in the 1944 Phillips Transactions

¶34 The district court also determined that, as a matter of law and undisputed fact, the City reserved the Water Rights when it conveyed the Anderson Ranch and the Clark Ranch to Phillips in 1944. Claimants take issue with this determination, directing our attention to the phrase "flood water right" in the Phillips Deed and asserting that, at a minimum, disputed factual issues remain to be decided regarding whether the Water Rights at issue here

were part of the "flood water right" that the City conveyed to Phillips. We disagree, and we affirm the district court's determination on this point.

A

¶35 As explained above, deeds are interpreted under the rules of contract interpretation, and the "overriding principle is that the intentions of the parties are controlling." *Ocean 18*, 2020 UT App 54, ¶¶ 20–21 (cleaned up). When interpreting a contract, courts examine the instrument in its entirety, considering "each . . . provision in relation to all of the others, with a view toward giving effect to all and ignoring none." *Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 2009 UT 27, ¶ 25, 207 P.3d 1235 (cleaned up). Before concluding that a contract is ambiguous, a court must first attempt to "harmoniz[e] conflicting or apparently ambiguous contract language," an exercise in which courts "examine the entire contract and all of its parts in relation to each other and give a reasonable construction of the contract as a whole to determine the parties' intent." *Gillmor v. Macey*, 2005 UT App 351, ¶ 19, 121 P.3d 57 (cleaned up). "A contract is facially ambiguous if its terms are capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994 (cleaned up). A "reasonable interpretation" is one "that cannot be ruled out, after considering the natural meaning of the words in the contract provision in context of the contract as a whole, as one the parties could have reasonably intended." *Brady v. Park*, 2019 UT 16, ¶ 55, 445 P.3d 395. And where a contract "is facially unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law, without resort to parol evidence." *Ocean 18*, 2020 UT App 54, ¶ 22 (cleaned up).

¶36 With those principles in mind, we proceed to examine the language of the Phillips Deed, which includes the following reservation of water rights:

> All water and water rights heretofore used on the aforesaid granted premises have been separately sold and transferred and this conveyance is made subject to the reservation of all water rights *excepting only a flood water right to which the cultivated or improved part of the aforesaid granted premises shall be entitled when and as long as such flood water is available.*

(Emphasis added.)

¶37 The parties offer two competing interpretations of the emphasized language. Claimants assert that the term "flood water right" encompasses their diligence-based Water Rights; stated another way, Claimants contend that the City conveyed to Phillips, through use of the phrase "flood water right," the diligence rights that form the basis for the Water Rights.

¶38 The City, by contrast, asserts that "flood water" refers to water that naturally and unpredictably rises over the banks of a river or stream during times of high flow, most often during the late spring when runoff is at a peak in Utah. *See, e.g.*, *Weber Basin Water Conservancy Dist. v. Gailey*, 303 P.2d 271, 271 (Utah 1956) ("The annual flood discharge [of the Weber River] from snow melt occurs in April, May and June, varying greatly from year to year, . . . [and] frequently flood[s] the valley farms in its course."); *see also Water*, Black's Law Dictionary (12th ed. 2024) (defining "floodwater" as "[w]ater that escapes from a watercourse in large volumes and flows over adjoining property in no regular channel"). Thus, as the City sees it, the term "flood water right" as used in the Phillips Deed simply provides Phillips (and his

successors) the right to use excess water that might happen to appear on the property during seasonal periods of flooding.

¶39    The City's interpretation is a reasonable one, and it harmonizes with the other parts of the Phillips Deed. The first part of the water rights reservation states broadly that "[a]ll water and water rights *heretofore used* on the aforesaid granted premises have been *separately sold and transferred* and this conveyance is made *subject to the reservation of all water rights*." (Emphasis added.) This provision references water rights appurtenant to the Anderson Ranch and the Clark Ranch other than the flood water right, suggesting that the flood water right is different from "water rights heretofore used" on the property. Furthermore, the City's interpretation harmonizes with the qualifier that the flood water right exists "as long as such flood water is available," words that carry an implication that the flood water right is seasonal and that the water associated with that right will not always be available.

¶40    Claimants' interpretation, by contrast, is not as convincing as the City's. Claimants ask us to interpret the general phrase "flood water right" to specifically reference (or at least include) pre-1903 diligence rights to use "1.0 cfs of water from 'Upper Spring'"—which the Hintzes' predecessor says was not even discovered until 1974, *see supra* note 7—for the irrigation of "5 acres and the stock-watering of 90 [head of sheep,] with a claimed priority date of 1880," appurtenant to the Anderson Ranch, and "3.0 cfs of water from 'Center Spring'" for irrigation of 7.07 acres, "stock-watering of 90 [head of cattle,] and domestic use for two families, with a claimed priority date of 1880," appurtenant to the Clark Ranch. This interpretation is hard to square with the ordinary contextual meaning of "floodwater," *see Water*, Black's Law Dictionary, which suggests that such water is inconsistent and has no defined quantity or point of diversion, and with other provisions of the Phillips Deed discussed in the previous paragraph, *see Brady*, 2019 UT 16, ¶ 55 (explaining that we must

first "consider[] the natural meaning of the words in the contract provision in context of the contract as a whole, as one the parties could have reasonably intended.").

¶41    Thus, "after considering the natural meaning of the words in the contract provision in context of the contract as a whole," *see id.*, one might readily conclude that Claimants' interpretation of the Phillips Deed's reference to "flood water right" is not just less convincing than the City's but is so unconvincing as to be unreasonable, and that the Phillips Deed can therefore be unambiguously interpreted in the City's favor.

B

¶42    But we need not go that far in this case, because even if we were to consider the term "flood water right," as used in the Phillips Deed, to be ambiguous, we would end up in the same place: construing the Phillips Deed in the City's favor as a matter of law and undisputed fact. *See, e.g., Buck v. Utah State Tax Comm'n*, 2022 UT 11, ¶ 48, 506 P.3d 584 ("[E]ven if we were to stretch and credit [the claimants'] interpretation as a reasonable one, resulting in an ambiguity, [the claimants] would still lose.").

¶43    If a court determines, as a legal matter, that a contract is facially ambiguous, then a question of fact exists as to the parties' intentions. *See Daines v. Vincent*, 2008 UT 51, ¶ 25, 190 P.3d 1269; *see also WebBank v. American Gen. Annuity Service Corp.*, 2002 UT 88, ¶ 22, 54 P.3d 1139 ("When ambiguity exists, the intent of the parties becomes a question of fact." (cleaned up)). As with any question of fact, the resolution of the question of the parties' intentions regarding an ambiguous contract is usually reserved for the factfinder. *See Brady*, 2019 UT 16, ¶ 53 n.37 ("When ambiguity does exist, the intent of the parties is a question of fact to be determined by the jury." (cleaned up)).

¶44    However, "even questions of fact may be decided as a matter of law at the summary judgment stage, so long as the parol evidence submitted by the parties is so one-sided that a reasonable factfinder could reach but one conclusion." *Ocean 18*, 2020 UT App 54, ¶ 29; *see also Cross v. Olsen*, 2013 UT App 135, ¶ 29, 303 P.3d 1030 ("Summary judgment is appropriate on . . . factual questions when they fall on either end of a factual continuum: when there could be no reasonable difference of opinion, or when the facts are so tenuous, vague, or insufficiently established that determining the factual issue becomes completely speculative." (cleaned up)).

¶45    In this case, the universe of extrinsic evidence involving the Phillips Deed is not extensive, and it clearly and one-sidedly supports the City's interpretation of the Phillips Deed. For starters, in the early 1940s, before purchasing the Anderson Ranch and the Clark Ranch, the City passed an ordinance stating that it was "necessary and advisable to purchase and acquire an additional water supply to supplement the existing municipally owned water system." And this ordinance authorized the "purchase [of] water rights, together with the necessary real estate in connection therewith," including the Anderson Ranch and the Clark Ranch.

¶46    Then, when the City published its "Notice for Bids" regarding the sale of the Anderson Ranch and the Clark Ranch, the City made clear its intent to keep the water rights: "All water rights appurtenant to or in any way appertaining to said lands will be reserved by [the City]."

¶47    Later, on the same day the Phillips Deed was executed, the City adopted a resolution authorizing Phillips to use the City's water rights appurtenant to the Anderson Ranch and the Clark Ranch, subject to the City's discretion. This resolution recognized that "[Phillips] is desirous of using the water that is now and has

heretofore been used on [the Anderson Ranch and the Clark Ranch]," and that the City "is willing that the water formerly used on said property may be used thereon until such time as [the City] may use it for other purposes or for municipal purposes." Moreover, one of the agreements between the City and Phillips permitting Phillips to use the water stated that it was "understood" between the parties that the water rights appurtenant to the Anderson Ranch and the Clark Ranch had been "[procured] for municipal purposes for the use and benefit of the inhabitants of Springville, Utah, and said water is to be retained and put to such uses just as soon as conditions and circumstances will permit."

¶48 This contextual evidence indicates that the City's general intent was to acquire more water for community and municipal use, and that it purchased the Anderson Ranch and the Clark Ranch primarily to obtain the water rights associated with those properties. Claimants' interpretation of the phrase "flood water right" is directly at odds with this contextual evidence, none of which suggests that the City was interested in conveying away (rather than acquiring) any non-ephemeral water rights.

¶49 Crucially, Claimants point to no extrinsic evidence on the other side of the ledger, and they offer only speculation as to the parties' intent regarding the meaning of "flood water right." Thus, even though questions involving ambiguous terms are usually questions for a factfinder, on this record we are well within our bounds to conclude "as a matter of law at the summary judgment stage" that "the parol evidence submitted by the parties is so one-sided that a reasonable factfinder could reach but one conclusion." *Ocean 18*, 2020 UT App 54, ¶ 29.

¶50 Our conclusion in this regard is bolstered by the fact that Claimants' interpretation of "flood water right" faces a constitutional hurdle. The "constitutional avoidance canon" is a

tool sometimes used in textual interpretation analysis, and courts invoke that canon when the language at issue "presents two possible meanings, one of which may be unconstitutional." *See Richards v. Cox*, 2019 UT 57, ¶ 40, 450 P.3d 1074. In such situations, courts assume that the drafters of the language at issue "meant, and so chose, the interpretation that is in harmony with the constitution."[10] *Id.* Constitutional avoidance rests "on the

---

10. The constitutional avoidance canon is usually employed to interpret statutes, *see Richards v. Cox*, 2019 UT 57, ¶ 40, 450 P.3d 1074, whereas here we are interpreting a term within a deed. However, courts often apply canons of statutory interpretation when analyzing the text of private instruments. *See Blyth-Fargo Co. v. Free*, 148 P. 427, 430 (Utah 1915) ("The rules or canons of interpretation which are resorted to by the courts to aid them in arriving at the meaning or intention of any written document, instrument, contract, or statute, are precisely the same in every case."); *see also Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 2009 UT 27, ¶ 25, 207 P.3d 1235 ("Under the well-established rule of construction *ejusdem generis*, we determine the meaning of a general contractual term based on the specific enumerations that surround that term." (cleaned up)); Susan Yorke, *The Curious Case of the Missing Canons*, 77 Stan. L. Rev. 1011, 1029, 1030–31 (2025) [hereinafter Yorke] (explaining that "text is text" and that "as a practical reality, courts frequently invoke interpretive canons when faced with textual ambiguities in contracts, statutes, or the Constitution," and observing that courts "frequently invoke interpretive canons when interpreting private legal instruments, like contracts, deeds, or wills"). Even where terminology differs, the canons of statutory interpretation often have analogues in contract construction. *See* Yorke at 1029–30 (comparing "the canon of constitutional avoidance (which counsels against a statutory construction that renders the provision unconstitutional)" with

(continued…)

reasonable presumption that where there is more than one plausible interpretation of [a given text], the [drafters of the language] did not intend the interpretation which raises serious constitutional doubts." *See State v. Garcia*, 2017 UT 53, ¶ 59, 424 P.3d 171 (cleaned up).

¶51 In this case, Claimants' assertion that the City conveyed the Water Rights to Phillips through the use of the phrase "flood water right" is in square tension with the Utah Constitution, which forbids any "municipality that owns, acquires, or controls water rights or sources of water supply to supply water to the public" from "directly or indirectly leas[ing], sell[ing], alienat[ing], or dispos[ing] of any of those water rights or sources of water supply." Utah Const. art. XI, § 6(1)(a). And this limitation "should not be narrowly or strictly construed," because it is "meant to secure to communities their water systems and prohibit any sale or lease to private parties." *Genola Town v. Santaquin City*, 80 P.2d 930, 935 (Utah 1938).

¶52 Our supreme court addressed this constitutional restriction in *Eskelsen v. Town of Perry*, 819 P.2d 770 (Utah 1991), and there the court held that a property owner's diligence claim was barred because a municipality had owned the land associated with the diligence claim before its conveyance to a private party. In that case, the Town of Perry had acquired seventy acres of land and had "expressly obtained all water rights" associated with the land, then conveyed part of the land to a purchaser without "expressly reserving [or] conveying" the water rights. *Id.* at 771.

---

"an analogue in the private context, which directs courts not to construe a contract in a manner that will render it unlawful if it reasonably can be construed in a manner which will uphold its validity" (cleaned up)). For these reasons, we are comfortable applying the constitutional avoidance canon to our deed-interpretation inquiry in this case.

Years later, the purchaser's successors-in-interest claimed to own diligence-based water rights appurtenant to the land, and they argued that because the water rights had not been "expressly reserved by the grantor," the water rights "passe[d] at the time of the conveyance of the land." *Id.* at 772. Our supreme court rejected this argument, citing the Utah Constitution, and held that the Town of Perry could not have conveyed the water rights away in the later transaction because it was not constitutionally permitted to do so. *Id.* Accordingly, the court concluded that "the fact that there was a municipal corporation in the chain of title precludes any claim by a subsequent owner to water rights stemming from a transfer of title out of the municipality." *Id.*

¶53 In this case, if we interpret "flood water right" in the Phillips Deed to have effectuated a conveyance of the Water Rights from the City to Phillips, then the City would have violated the Utah Constitution. If, however, the Phillips Deed did not convey any recognized and quantified water right or water source but, instead, merely recognized that Phillips could make use of seasonal excess flows of water if and when they are available, then no constitutional problem is presented. Thus, we must decide between two interpretations of the Phillips Deed: one that is constitutional and one that isn't. Invocation of the constitutional avoidance canon here counsels in favor of the City's interpretation of the Phillips Deed, because under that interpretation, the City did not act unconstitutionally.

¶54 But that is not quite the end of the analysis. Claimants argue that the City's conveyance of the Water Rights to Phillips was constitutional because it was part of an "exchange" of water rights consistent with the Utah Constitution's provision allowing municipalities to "exchang[e] water rights or sources of water supply for other water rights or sources of water supply that the municipality determines will equally enable the municipality to meet the needs of its designated water service area." Utah Const.

art. XI, § 6(2)(c). In support, Claimants argue that this is evidenced by Phillips's bid to the City, including his offer to pay for the Anderson Ranch and the Clark Ranch partly with cash but partly with SIC stock shares and other water rights in Bartholomew Canyon. And Claimants point to the subsequent agreements between the City and Phillips as evidence of this exchange.

¶55  But this argument rests entirely on speculation. Claimants have not pointed to any evidence indicating that either the City or Phillips understood the City's conveyance of a "flood water right" to have been part of an exchange of water rights that would "equally enable" the City to "meet the needs of its designated water service area." *Id.* Claimants point to no assessment in the record undertaken by the City or Phillips that shows that the exchange would satisfy any of the City's municipal needs. By contrast, the City points to substantial evidence in the record showing that the City was in the process of acquiring *more* water rights and that it purchased the Anderson Ranch and the Clark Ranch, among others, for precisely that purpose. We also note that Phillips offered his water rights along with $2,000 as part of his initial bid, a bid that was subsequently accepted. Thus, there is no evidence that either party intended the City's conveyance of a "flood water right" to be part of any exchange of water rights consistent with Article XI, Section 6(2)(c).

¶56  And the subsequent agreements between the City and Phillips regarding his use of the City's water are of no assistance to Claimants in this regard. The first two agreements restate the City's "reserv[ation of] all water rights now and heretofore used upon [the Anderson Ranch and the Clark Ranch] except flood water," and include the qualifier that "[i]t is understood and agreed that nothing in this agreement shall be construed to bind [the City] for any definite period of time" and that "as long as [the City] considers it advisable to use the water rights herein mentioned for irrigation purposes and does not use said water for

its own purposes that [Phillips] may have the first privilege to lease and use said water." And finally, the third agreement states plainly that Phillips "agreed to transfer and relinquish to [the City] certain water rights" "as part of the consideration" for his purchase and acquisition of the Anderson Ranch and the Clark Ranch from the City. These agreements do not mention any exchange of equivalent water rights, and given the qualified language of the City's reservation of water rights in these agreements, we simply see no support in these agreements for the proposition Claimants advance. Indeed, it appears that Phillips was provided only the privilege to use certain water rights— owned by the City—subject to the City's complete discretion.

¶57 For all of these reasons, even if we assume for purposes of the discussion that the phrase "flood water right" is ambiguous, the interpretation of that phrase remains a matter that can be determined as a matter of law on summary judgment. The available extrinsic and contextual evidence, including applicable interpretive canons, all point in one general direction: that the City did not convey any quantifiable water right to Phillips when it conveyed to Phillips a "flood water right" associated with the Anderson Ranch and the Clark Ranch. Thus, as a matter of law and undisputed fact, when the City conveyed the Anderson Ranch and the Clark Ranch to Phillips in 1944, it reserved for itself the Water Rights now claimed by Claimants.

### III. Claimants Were Afforded Due Process

¶58 Finally, Claimants argue that they were denied due process for lack of notice. Specifically, they assert that they were not given adequate notice because neither the City nor SIC—in their initial objections to the PD—specifically referenced the transfers of land or water rights in the 1920s or the 1940s as the basis for their objections to the PD. For the reasons discussed, we reject this argument and hold that Claimants were afforded due process.

¶59    The PD in this case was issued in 1986, and at that time, the operative statutory provision required that any party wishing to object to a proposed determination needed to "file with the clerk of the district court a written objection thereto duly verified on oath." Utah Code § 73-4-11 (1986); Water and Water Rights, ch. 67, § 32, 1919 Utah Laws 186; *see also In re Gen. Determination of Rights to the Use of Water*, 2004 UT 106, ¶ 19, 110 P.3d 666 (noting, in reference to Utah Code section 73-4-11, that "[a]ll relevant portions of the statute have remained unchanged since 1919, the year the statute was first enacted").

¶60    In this case, the City filed an objection and alleged that its rights would be negatively impacted if the State Engineer recognized Claimants' predecessors as the owners of the Water Rights. The City's objection also alleged that Claimants' claim to the Water Rights is invalid and that Claimants' claim should be denied. The same is true of SIC's objection.

¶61    The statute's plain language only required the City to "file with the clerk of the district court a written objection thereto duly verified on oath." Utah Code § 73-4-11 (1986). There was no pleading standard incorporated into the statute at the time of the City's filing, nor were there any requirements that the objections include a listing of each basis or legal theory supporting the objection. *See id.* We also note that, in the years following the filing of the City's objection, Claimants (and their predecessors) were given the opportunity to engage in discovery, develop an extensive record, and respond to the specific legal arguments the City made in support of its motions for summary judgment, including its assertions involving the 1920s-era agreements and the 1940s-era agreements. Thus, Claimants were given adequate notice in this case and were not denied due process of law.

CONCLUSION

¶62    The City acquired the Anderson Ranch and the Clark Ranch, along with all water rights appurtenant to these parcels, in 1941 and 1942. The City then conveyed these parcels dry to Claimants' predecessor in 1944, reserving all quantifiable water rights (including the Water Rights) for itself. Thus, as a matter of law and undisputed fact, Claimants have no valid claim to the Water Rights. Accordingly, the district court did not err by entering summary judgment in favor of the City and sustaining the City's objection to the PD with respect to the Water Rights.

¶63    Affirmed.

———————